**Brenda EVANS et al., Plaintiffs,**

v.

**Madeline BUCHANAN et al., Defendants.**

**Civ. A. Nos. 1816–1822.**

United States District Court,
D. Delaware.

Aug. 5, 1977.

Joseph A. Rosenthal and Irving Morris of Morris & Rosenthal, and Louis L. Redding, Wilmington, Del., for individual plaintiffs.

Richard Allen Paul of Paul, Lukoff & Hurley, Wilmington, Del., of counsel, Louis R. Lucas, Ratner, Sugarmon, Lucas, Salky & Henderson, Memphis, Tenn., Paul R. Dimond of O'Brien, Moran & Dimond, Ann Arbor, Mich., for intervening plaintiffs.

Richard R. Wier, Jr., Atty. Gen., State of Del., and Regina M. Small, Asst. Atty. Gen., State of Del., William Prickett and Mason E. Turner of Prickett, Ward, Burt & Sanders, H. James Conaway of Young, Conaway, Stargatt & Taylor, Wilmington, Del., for defendant State Bd. of Ed.

Edward W. Cooch, Jr., of Cooch & Taylor, Wilmington, Del., for Marshallton-McKean School Dist.

Samuel R. Russell of Biggs & Battaglia, Wilmington, Del., for Alexis I. duPont School Dist.

William Poole of Potter, Anderson & Corroon, Wilmington, Del., for Alfred I. duPont School Dist.

James T. McKinstry of Richards, Layton & Finger, Wilmington, Del., for Claymont and Stanton School Dists.

John P. Sinclair of Potter, Anderson & Corroon, Wilmington, Del., for Newark School Dist.

Jerome O. Herlihy of Herlihy & Herlihy, Wilmington, Del., for Conrad Area School Dist.

Howard M. Handelman and Jeffrey M. Weiner of Bayard, Brill & Handelman, Wil-

mington, Del., for New Castle County Vocational-Technical School Dist.

James M. Tunnell, Jr., and Richard D. Allen of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for Mount Pleasant School Dist.

Aida Waserstein, Wilmington, Del., for intervening Hispanic plaintiffs.

David Anderson of Potter, Anderson & Corroon, Wilmington, Del., for New Castle-Gunning Bedford School Dist.

Thomas S. Lodge of Connolly, Bove & Lodge, Wilmington, Del., for DeLaWarr School Dist.

MURRAY M. SCHWARTZ, District Judge.

## I. INTRODUCTION

Presently before the Court are two motions filed by the Delaware State Board of Education ("State Board").[1] The first is a motion to stay all proceedings in this case pending a determination by the Supreme Court of the State Board's petition for a writ of certiorari.[2] The second motion urges that the Court adopt as a plan for desegregating the public schools of Northern New Castle County the proposal contained in the State Board's report submitted to the Court on July 14 pursuant to a mandate of the Court of Appeals for the Third Circuit. On their face, these motions appear analytically and legally distinct. Closer examination, however, reveals that the issue of the acceptability of the State Board's plan is inextricably bound up with the issue of the propriety of a stay.

As discussed more fully infra,[3] one of the factors a court must weigh in considering a motion for a stay is whether the movants will suffer irreparable injury if the stay is not entered. The mandate of the Third Circuit which affirmed, with certain modifications not relevant here, the June 15, 1976 Order of the three-judge court ("June 15, 1976 Order"), designated September, 1977 for the initial implementation of a desegregation remedy. The injury defendants allegedly will suffer, absent a stay, derives basically from the residual effects of implementing a remedy that may be vacated and remanded or reversed. Therefore, it is essential that this Court attempt to determine if there is a meaningful quantum difference in such injury between the remedy proposed by the State Board and that developed by the three-judge court and affirmed as modified by the Third Circuit.[4] If there is a substantial difference in impact upon defendants, it must then be determined what remedy will take effect if a stay is not entered.

The proposal of the State Board now before the Court constitutes that Board's proposed remedy. If the Court finds the proposal unacceptable, then the State Board, pursuant to the mandate of the Third Circuit, must appoint a five-member "New Board" and that New Board is charged with the responsibility of planning and implementing a desegregation remedy. Because questions have been raised regarding the precise responsibility assigned to the New Board, a brief digression is necessary.

1. Doc. 538; Transcript of July 18, 1977 Argument (hereinafter July 18 Tr.) AM–11. All of the suburban school districts who are intervening defendants, except the DeLaWarr School District, have joined in the State Board's motion. July 18 Tr. AM–4–6, DeLaWarr opposes the stay motion. Transcript of Hearings Held July 19–25, 1977 (hereinafter "Hearings Tr.") 216.

2. The State Board's Petition for Writ of Certiorari was docketed on July 25, 1977 in the Supreme Court of the United States. At the time of the hearings (July 19–25), the suburban school districts had not yet filed their respective petitions for a writ of certiorari, but with

the exception of DeLaWarr, several have made clear their intention to do so. Docs. 540, 543, 544. By its motion seeking adoption of the plan, the State Board is not altering or waiving its basic position that no unconstitutional segregation exists in the public schools in Northern New Castle County.

3. See p. 842 infra.

4. The June 15, 1976 Order called for the implementation of the one-district plan developed by the three-judge court unless the State Board and legislature enacted their own constitutional plan prior to September, 1977.

Some confusion has arisen over whether the New Board is intended to devise an entirely new desegregation plan, including governance, or merely is to complete the planning and administrative work necessary to implement the one district plan outlined by the three-judge court in its May 19, 1976 opinion. *See Evans v. Buchanan*, 416 F.Supp. 328, 352–358 (D.Del.1976). The text of Paragraph 4 of the mandate is virtually a verbatim restatement of Paragraph 3 of the Order of June 15, 1976. Subsequent to the entry of the three-judge court Order, a five member Board ("Interim Board") was appointed. The membership was expanded to thirteen members by the Delaware Legislature.[5] The Interim Board labored over the past 13 months to devise a desegregation plan and apparently understood their powers to include the development of an entirely new plan that did not use the one-district concept. Evidence of this approach is found in their report submitted to the State Board of Education. (Doc. 528A) That report suggested the retention of the 11 existing school districts during a two year transition period, but also recommended that the school districts be supervised by a board composed of representatives from the 11 school districts. This governance structure is clearly inconsistent with the June 15, 1976 Order which required transfer of full authority to the Interim Board and abolition of the existing 11 school districts no later than September 1, 1977.[6] The approach taken by the Interim Board may have been due in part to the fact that the State Board appears to have shared that interpretation of the June 15, 1976 Order.[7]

Because the Third Circuit was concerned only with the June 15, 1976 Order and the May 16, 1976 Opinion, conceivably and perhaps probably it was unaware of this history that was not made a part of the record in this case and thus did not realize that the adoption of the language of the June 15, 1976 Order carried with it a substantial historical gloss. In any event, notwithstanding what interpretation the Interim Board or the State Board placed on the June 15, 1976 Order, the Third Circuit mandate, when read in light of Part IV of the Third Circuit Opinion of May 18, 1977,[8] contemplates that the New Board will concern itself with the development of a desegregation plan only in the context of the one district governance concept described by the three-judge court.

Thus, the Court is faced with two possibilities. If the State's proposal is accepted, it will be implemented in September, 1977, and will have certain effects on the current structure and operation of the affected Northern New Castle County school districts. If the State's plan is not accepted, the New Board will be appointed and, in the absence of a stay, the one district plan will be implemented in the fall of 1977, with the concomitant demise of the eleven affected districts.

The question of what injury the movants will suffer in the absence of a stay pending determination of their application for certiorari involves primarily an examination of the effects of the plan that is implemented. The one-district plan would require at a minimum the abolition of the ten suburban and Wilmington school districts as distinct entities, a substantial reorganization of the administrative internal structure, certain major decisions involving adjustments to the tax rates and teacher salaries in the now separate districts, as well as a wholesale reorganization of pupil and teacher assignments. The State Board's proposal does not contemplate the vast administrative reorganization involved in the one-district plan, but potentially could lead to major changes in pupil and teacher assignments.

Substantial disruption of the educational process in the affected school districts

---

5. Senate Bill No. 796, as amended by Senate Amendment No. 1 (June 25, 1976).

6. Paragraphs 3(d); 7 of June 15, 1976 Order.

7. Doc. 528 Appendix B at 1.

8. *Evans v. Buchanan*, 555 F.2d 373, 380–81 (3d Cir. 1977); for the relevant text of Part IV, *see infra* at 840 n. 29.

would occur if either plan is implemented and the Third Circuit subsequently is reversed. However, clearly the disruption caused by the disengagement of the one-district plan would be more substantial and severe than if disengagement of the State Board's proposal were required.[9] Because of this difference, it is impossible for the Court to evaluate accurately the factor of irreparable injury without first determining which plan is to go into effect absent a stay. Accordingly, after a brief recitation of the current factual and procedural background pertinent to a determination of the present motions, consideration will be given to the acceptability of the State Board's proposal prior to examining the merits of the Motion for a Stay.

## II. CURRENT FACTUAL AND PROCEDURAL BACKGROUND

Prior opinions detail the history of this 20 year litigation,[10] including the proceedings since 1971 on plaintiffs' amended complaint. For present purposes, it is only necessary to review what has transpired subsequent to the May 19, 1976 three-judge court remedy decision which was preceded by a Supreme Court summary affirmance of the three-judge court Order emanating from its two opinions in which it found the constitutional rights of plaintiffs had been violated. Following the three-judge court remedy decision, the State Board of Education and intervening defendant school districts filed a direct appeal to the United States Supreme Court, as well as a protective appeal to the Third Circuit Court of Appeals. Defend-

ants' protective measure proved necessary as the Supreme Court dismissed the direct appeal for want of jurisdiction. *Delaware State Board of Education v. Evans*, 429 U.S. 973, 97 S.Ct. 475, 50 L.Ed.2d 579 (1976). Thereafter, the Third Circuit sitting en banc [11] affirmed the decision of the three-judge court with certain modifications in an Opinion dated May 18, 1977. *Evans v. Buchanan, supra*, 555 F.2d 373. Because of the modifications contained in the majority opinion, the Third Circuit set forth the specific order to be entered by this Court, and remanded for entry of that order.[12]

On May 19, 1977, this Court entered the order delineated in the Third Circuit majority opinion. The Third Circuit's order replicated much of the order originally entered by the three-judge court, and from which the appeal had been taken. The Third Circuit mandate also directed that the State Board of Education (or other appropriate authority) was to file a "formal report in accordance with Part IV [Governance] of the Opinion of the Court of Appeals of the Third Circuit within 60 days from May 18, 1977." *Evans v. Buchanan, supra*, 555 F.2d at 381.

On July 14, 1977, defendant State Board of Education filed a formal report as required by the order. The report disclosed that the only concrete measure which had been taken since entry of the three-judge court remedy order was passage of legislation authorizing majority to minority voluntary transfers. This would permit transfers of black students from the Wilmington and DeLaWarr [13] School Districts to the

9. July 18 Tr. AM–78–79.

10. This law suit began in 1957 with the current phase activated in 1971. *See, e. g., Evans v. Buchanan*, 424 F.Supp. 875, 876–78 (D.Del. 1976); *Evans v. Buchanan*, 416 F.Supp. 328, 334–35 (D.Del.1976); *Evans v. Buchanan*, 393 F.Supp. 428, 430–31 (D.Del.1975); *Evans v. Buchanan*, 379 F.Supp. 1218, 1220–21 (D.Del. 1974).

11. Chief Judge Seitz and Judge Gibbons did not participate in the en banc consideration of the appeal.

12. The Third Circuit further directed that its mandate was to issue "forthwith," as opposed

to the normal time for issuance contained in F.R.App.P. 41(a), which provides: "The mandate of the court shall issue 21 days after the entry of judgment unless the time is shortened or enlarged by order."

13. Throughout these proceedings the DeLaWarr School District, which has an approximate black enrollment of 55% (Department of Public Instruction ("DPI") Ex. 52, p. 11), has pursued a different role than its suburban counterparts. DeLaWarr intervened as a defendant, along with the other suburban districts of New Castle County, following the Supreme Court's decision in *Milliken v. Bradley*, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069

remaining intervening suburban school districts, and transfers of white students from the suburban school districts to either the Wilmington or DeLaWarr School District.[14] The report also contained a "plan" proposed by the State Board of Education which purportedly complied with the requirements established in the majority opinion of the Third Circuit. However, the State legislature neither has expressly adopted the plan through legislation nor has it conferred upon the State Board the discretionary authority it would need to implement the plan. Thus, the State Board, which lacks statutory authority to make pupil assignments across district lines, could not implement its proposed plan, even if it so desired.[15] The proposed plan only can be implemented by Order of this Court, pursuant to the exercise of its equitable powers.

At the request of the Court and so that the State Board's proposed plan could be considered in an appropriate procedural context, the State Board filed a motion seeking adoption of its plan by the Court. The motion was filed under objection by the State Board, and with reservation of its opposition to adoption of any interdistrict remedy.

Argument on the State Board's application for stay was held on July 18, 1977 and hearings were held on the State Board's plan from July 19–25, 1977. Plaintiffs vigorously opposed acceptance of the State Board's plan and granting of the stay. They also sought to introduce their own plan, labeled Plan Q. The Court did not accept the plan into evidence, although it permitted plaintiffs to make an offer of proof on the record concerning Plan Q.[16] None of the suburban school districts made offers of proof concerning alternate plans, although they were accorded the opportunity to do so.

At the hearings, counsel for the suburban school districts indicated that they viewed the voluntary transfer legislation to be sufficient to vindicate the constitutional rights of plaintiffs which had been infringed. If the Court did not agree with that proposition, the suburban school districts indicated that the State Board's plan was acceptable as a second choice. Counsel for the subur-

(1974). However, unlike the other intervening school districts which opposed adoption of an interdistrict remedy, DeLaWarr has aligned itself primarily with plaintiffs in seeking an interdistrict remedy. For this reason, unless otherwise noted, references hereinafter to "the suburban school districts" will not include DeLaWarr, and also will not include Appoquinimink School District, which was excluded from the desegregation area by the three-judge court.

14. Legislation passed as the sole response to the three-judge court Order of June 15, 1976 for the 1976–77 school year permitted a student in the delineated desegregation area to transfer from his district to any other district that would accept him. 14 Del.C. 603(c). All but two suburban school districts accepted black students as transferees, but not white students. The Wilmington District refused to forward records of white students. (DPI Ex. 52, p. 4)

Prior to the Third Circuit opinion, the legislation was recast only for the 1977–78 school year to require school districts "to accept all applications for transfers by applicants who are members of the race which is in the majority for the 1976–77 school year in the public school district in which they reside and which is in the minority for the 1976–77 school year in the school district to which they apply as

transfers. . . ." 129th Gen. Assembly Sen. Bill No. 173. For the 1977–78 school year, somewhere between 746 (PX–3A) and 1,194 (DPI 50) or between approximately 6.6 and 10.5% of the black students from Wilmington have elected to transfer to a suburban district. In addition, 302 black students from DeLaWarr or approximately 17.5% of the DeLaWarr black student population elected to transfer to other suburban districts. In contrast to voluntary transfer of blacks, only 3 white students elected to transfer into Wilmington and none into DeLaWarr. DPI Ex. 50.

15. It is noted, however, that between 1968 and 1973, the State Board, by regulation, subsidized interdistrict transportation of students, while legislation passed by the General Assembly limited such subsidization to intradistrict transportation. 94% of the students receiving transportation subsidies were white. For a fuller discussion, see Evans v. Buchanan, supra, 393 F.Supp. at 436–37.

16. This Court ruled that it would not commence another round of hearings on plans. The offer of proof was permitted to enable plaintiffs and suburban districts to make the necessary record to preserve this point on appeal.

ban districts also either orally joined in the application of the State Board for a stay, or as in the case of the Newark, Marshallton-McKean, Claymont and Stanton School Districts, filed their own stay applications.[17] (Doc. Nos. 540, 543, 544)

In summary, in the fourteen months between issuance of the three-judge court remedy opinion and commencement of the July, 1977 hearings, the only steps taken by the State to devise and implement school desegregation was passage of the voluntary transfer legislation as previously rehearsed and proposal of a plan by the State Board which it had no power to implement. Attention is now turned to the State Board's proposal.

## III. STATE BOARD'S PROPOSAL

The proposal submitted by the State Board of Education would require that all black students in Wilmington in grades 7 through 12 be assigned to suburban school districts for the school year 1977–78.[18] Each student, however, would retain the right to elect to remain in his or her Wilmington school.[19] Three general questions frame this Court's inquiry into the acceptability of the plan: (1) Whether the Third Circuit's mandate contemplated the presentation of a proposal for desegregation which requires a federal court order to be implemented; (2) Whether the proposal purports to achieve that degree of fairness essential to the framing of any equitable decree, which is to remedy a constitutional

violation; (3) Whether the proposal's provisions promise realistically to desegregate the public schools of Northern New Castle County now. See Green v. County School Board of Kent County, 391 U.S. 430, 439, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).

In its report to the Court,[20] the State Board takes the position that it is not "feasible" to determine what the affected school districts and school populations would be today "but for" the constitutional violations found by the three-judge court and affirmed on appeal.[21] It is the State Board's position, however, that its proposal represents a "practical and realistic response" to the Circuit Court mandate.[22]

The State Board's proposal recommends the assignment of black students residing in Wilmington and enrolled in grades 7 through 12 to suburban school districts for the 1977–78 school year. As part of this process, attendance zones are to be drawn in the City of Wilmington corresponding to the various suburban districts.[23] In effect, for purposes of pupil assignment, each attendance zone would be part of the suburban district to which the Wilmington students residing therein would be assigned.[24] For the 1978–79 school year, grades 1 through 6 are to be incorporated into the plan and the attendance zones are to be redrawn, if necessary, to balance roughly the percentage of black students in each school district.

17. The DeLaWarr School District opposed both the State Board's plan and the various applications for stays. No position on either motion was taken by the Appoquinimink School District, which was not represented at the hearings, nor by the New Castle County Vocational-Technical School District, which was represented at the hearings, but was exempt from the provisions of the Order of June 15, 1976.

18. The unmistakable implication of counsel's varied statements and the testimony given during the July, 1977 hearings was that removal by the Third Circuit majority of the three-judge court guidelines as the starting point of what would constitute a prima facie desegregated school permitted consideration of "one way" busing as an acceptable court imposed equitable remedy.

19. The testimony adduced at the hearings clearly indicated that the State Board does not intend for its proposal to supplant the majority to minority voluntary transfer legislation, but rather anticipates that the two plans would be coordinated. See also Doc. 548 at 83.

20. Report of the State Board of Education Required by the Opinion and Order of the Circuit Court of Appeals in this Case. (Doc. 548)

21. Doc. 548 at 36–37.

22. Id. at 37.

23. Id. at 82.

24. Hearings Tr. at 319.

As noted earlier, the proposal permits any student to elect to remain at his or her present school. Testimony given at the hearings indicated that for the 1977–78 school year, a student would have between ten and twenty days prior to the opening of school to decide whether to transfer back to his or her Wilmington school.[25] Thus, the choice would have to be made without the benefit of having attended the suburban school, perhaps without even having visited it, and, if assigned to a suburban district with several schools serving the same grade level, without knowing the exact school within the district to which assignment would be made. For those who elect to accept their suburban assignments, they may revoke their choice by submitting a form prior to April 30, 1978. These students would then return to their Wilmington schools for the 1978–79 school year.[26]

The State Board's proposal contains additional provisions covering the varied responsibilities of the various school districts including tuition payments, the establishment of local grievance procedures for parents, and transportation. The proposal also sets out a procedure whereby Wilmington teachers displaced by the exodus of students to the suburbs can seek employment with suburban districts. Basically the proposal requires each suburban district to hire one Wilmington teacher for each state unit of pupils transferred from Wilmington to its district, assuming a sufficient number of qualified Wilmington teachers apply.[27] The exact procedure to be used in implementing this policy is somewhat unclear. Ultimately, however, the affected teachers would be faced with deciding whether to remain at their higher paying positions in Wilmington in the hope they will not be terminated in the spring of 1978 or to seek lower paying positions with a suburban district.[28]

The absence of implementing legislation creates the need for an order by this Court

before the State Board's proposal can be put into operation. That fact raises an issue of serious concern. Paragraph 2 of the mandate of the Third Circuit orders the schools in Northern New Castle County to be "desegregated in accordance with the Opinion of the Court of Appeals for the Third Circuit" and to be "reorganized into a new or such other new districts as shall be prescribed by the state legislature *or* the State Board of Education. . . ." (emphasis added) Paragraph 4 of that mandate provides: "The State Board of Education shall, if the state legislature or the State Board of Education do not promptly comply with paragraph 2 of this Order [appoint the New Board] . . . to oversee the operation of the schools of the area as defined in ¶ 2 of this Order. . . ." It must be determined whether the mandate permits consideration of a State Board proposal that requires a federal court order for implementation or, alternatively, only gave the State of Delaware the opportunity to formulate its own desegregation plan which was to be self-executing and thus without need for further judicial action.

The State Board argues that the use of the word "or" in paragraphs 2 and 4 of the mandate is critical. Its position is that the Third Circuit was well aware that the State Board has no power to reorganize school districts or to reassign students; that power resides exclusively with the legislature. By its use of the word "or," the State Board contends the Third Circuit clearly intended to permit two possible courses of action: (1) the legislature could act to reorganize the school districts and pupil assignment patterns; (2) the State Board could submit to this Court a plan to desegregate the relevant school districts which, if satisfactory, would then be implemented by court order.

At first blush, the defendant's argument has certain appeal, especially since the cru-

---

25. DPI Ex. 55; Hearings Tr. 237–238.

26. The State Board's report is ambiguous and the testimony of witnesses uncertain as to whether a student, having elected to stay in Wilmington, can retract the election in a subse-

quent year and return to his assigned suburban school. Hearings Tr. 261–64.

27. Doc. 548 at 85.

28. *Id.* at 85–86.

cial phrase was added by the Third Circuit to the basic language of the three-judge court Order of June 15, 1976. But when viewed from the broader context of the current posture of this litigation and its prior development, it is concluded that the mandate does not permit adoption of a State Board plan in the absence of implementing legislation.

Prior to the issuance of its May 19, 1976 Opinion, the three-judge court solicited and received nineteen proposed plans to remedy the violations found by that Court. The proposals included both interdistrict and Wilmington-only plans. After having been submitted to the Department of Public Instruction for professional comment and evaluation, the three-judge court held three weeks of hearings, during which many of the proposals underwent modification. *Evans v. Buchanan, supra,* 416 F.Supp. at 334–35. After this extensive exposure to a wide variety of plans, the three-judge court declined to adopt any of the proposed plans and ordered the implementation of a plan based on the concept of one district. However, the Court stressed that its remedy would not take effect if the State Legislature and State Board were to act to implement their own constitutional desegregation plan. *Evans v. Buchanan, supra,* 416 F.Supp. at 357. Clearly, the three-judge court was not inviting the submission of a new desegregation plan that would require entry of a court order before implementation could take effect. Rather, the Court was indicating its continued willingness to defer to the legislative process in developing a remedy so long as the remedy passed constitutional muster.

Similarly, the Third Circuit mandate did not anticipate the submission of a new proposal that would form the basis of a judi-cially ordered remedy. In Part IV of its Opinion, the majority expressly affirmed and approved the three-judge court's decision to permit the State Legislature and State Board to act so as to pre-empt the need for a judicial remedy. When viewed in the light of all that has preceded the current posture of this case and Part IV of the Third Circuit majority opinion,[29] the conclusion seems inescapable that this Court has been directed to proceed to the prompt appointment of the New Board and to the implementation of the one district remedy unless timely action by the State rendered such action unnecessary. The time for that action has expired.

Accordingly, the Court concludes that it may not consider the merits of the State Board's proposal. The mandate of the Third Circuit contemplates only two possibilities: (1) action by the State enacting its own plan for desegregation; or (2) appointment of the New Board and implementation of the one-district plan. As the State has not acted, this Court must.

■■■ Even if this Court were permitted to consider the State Board's proposal, the result in this case would be no different. I find the proposal unacceptable as an equitable remedy for the constitutional violations found by the three-judge court. The most obvious and significant flaw is that the proposal places the entire burden of the remedy on those whose rights have been violated. In formulating a remedy for constitutional violations, this Court must exercise its equitable powers. One would find it difficult to create a more graphic paradigm of an inequitable remedy than one which assigns to those who have been wronged the responsibility of correcting those wrongs. The uncontroverted testimony

---

**29.** "In ordering reorganization or consolidation of the New Castle County school districts, the district court stressed that 'the State Legislature and the State Board of Education may take such steps as are not violative of constitutional rights to change the pattern set here,' 416 F.Supp. at 357, and ordered creation of an interim board to operate the schools 'for so long as the State takes no action.' *Id. We specifically affirm this governance plan and* *emphasize that prompt compliance by the state may make action by the interim board unnecessary.* Moreover, we do not mandate any specific number of districts which the state may create within the area presently encompassed by the defendant districts nor do we require that all the existing districts be reconstituted. We do caution that a 'Wilmington only' plan will not be adequate." 555 F.2d 373, 380–1 (3d Cir. 1977). (emphasis added)

from State Board of Education personnel adduced at the hearings established that: no white student, suburban or city, would be assigned to a different school district, but every black student in Wilmington would be reassigned.[30]

Additionally, if every black student accepted his or her assignment, the resulting effect on the Wilmington School District would be the creation of a virtually all white public school system with the exception of certain specialized schools and kindergartens which would remain substantially all black.[31] Conversely, if all black students chose to transfer back to their familiar Wilmington district rather than face the "unknown" in a suburban district, there would be no extensive dismantling of the dual school system found by the three-judge court to exist in Northern New Castle County. Thus, the closer the actual experience approaches either extreme, the further away is the accomplishment of desegregation.

This Court also is charged with the responsibility of supervising a desegregation plan that "promises realistically to work now." *Green v. County School Board, supra,* 391 U.S. at 439, 88 S.Ct. 1689. *See also Louisiana v. United States,* 380 U.S. 145, 154, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965). A basic problem with the State Board's proposal is that no one knows what the plan promises to accomplish. Indeed witnesses from the State Department of Public Instruction expressly declined to predict the results of implementing the plan and disclaimed that any conclusions could be inferred from the history of the voluntary transfer program.[32]

At bottom, the State Board's proposal, dubbed "reverse volunteerism" by its propo-

nents, is based on the concept of "freedom of choice," even though the initial assignment of the students is involuntary. Such a proposal viewed in the context of its proponents being unable to represent it will work and the more than twenty year delay in the dismantling of an interdistrict dual school system simply is unacceptable as an equitable remedy and inconsistent with the mandate of the Supreme Court in *Green. Green v. County School Board, supra,* 391 U.S. at 439, 88 S.Ct. 1689.

Having concluded that the State Board's proposal is unacceptable for procedural, equitable and substantive reasons, it follows that unless a stay motion is granted, the school districts of Northern New Castle County will be desegregated in the fall of 1977 with governance in a single district in accordance with the Opinion of the Court of Appeals for the Third Circuit. Accordingly, attention is now turned to the motion for stay.

## IV. MOTION FOR STAY

A motion for a stay is addressed to the sound discretion of the Court. *Coppedge v. Franklin County Board of Education,* 293 F.Supp. 356, 362 (E.D.N.C.1968). The burden of the State Board and the suburban school districts in the case at bar is to make: (1) a showing that they will suffer irreparable injury if the stay is denied; (2) a strong showing they likely will succeed on the merits of their appeal; (3) a showing the plaintiffs will not be substantially harmed by the stay; and (4) a showing no harm will be done to the public interest. *Reserve Mining Co. v. United States,* 498 F.2d 1073, 1076–1077 (8th Cir.), *application to vacate stay denied,* 419 U.S. 802, 95 S.Ct. 287, 42 L.Ed.2d 33 (1974).

---

**30.** It is noted in passing that no suburban teacher would have his or her job jeopardized, but Wilmington teachers would have to make very difficult decisions concerning their jobs and, for some, pension rights would be affected. A teacher's pension is calculated based on the last five years' salary. Since Wilmington teachers are paid a higher salary than their suburban counterparts, acceptance of a job in suburban school at a lower salary could affect

the pension rights of an individual teacher. While the unfairness to the Wilmington District teacher is mentioned, it must be remembered it is the constitutional right of students, not Wilmington District teachers, that must be remedied.

**31.** Hearings Tr. 69–75.

**32.** *See, e. g.,* Hearings Tr. 172–73.

██ Although the above criteria must be applied individually to the facts of this case, the ultimate decision by the Court must be made in light of all the criteria, unless the movant's claim is so palpably devoid of any showing of irreparable injury or probability of a successful appeal that further consideration of other factors would be futile. *See Evans v. Buchanan, supra,* 424 F.Supp. 875. As a court of equity exercising its discretionary authority, it is essential that in the final analysis all four factors be considered together and the relative showings be measured. Further, the express language of the criteria reflects that a court should not and perhaps cannot erect an artificial absolute standard; there are degrees of irreparable injury and probability of a successful appeal. The duty of this Court is to weigh the strength of these showings against each other and balance them against the potential harm to the interests of the plaintiffs and the public.[33] *Cf. Alaska Interstate Co. v. McMillian,* 402 F.Supp. 532 (D.Del.1975).

## A. Irreparable Injury

As noted earlier, the issue of irreparable injury in the context of this stay motion involves measuring the effect upon defendants of implementing a remedy during the pendency of the State Board's petition for writ of certiorari to the Supreme Court. The preceding section of this Opinion discussed the inadequacies of the State Board's proposal and the corollary conclusion that the one district plan, as modified on appeal, must be implemented. Thus, the issue is what irreparable injury, in the absence of a stay, implementation of the plan will cause the defendants.

The most cataclysmic change that will occur if a stay is not granted is the abolition of the eleven affected school districts as distinct political and administrative entities. The consequences of this major reorganization are similarly very serious. Affidavits submitted to the Court by various school administrators recited a litany of major decisions that would have to be made in order to convert from eleven districts to one.[34]

At this late date, the various school districts through the governmental offices of New Castle County have completed sending statements to taxpayers which will lead to collection of tax revenues for the 1977–78 school year. Those taxes are collected on the basis of different rates determined by district operating expenses and debt service requirements.[35] The New Board would be faced with the responsibility of distributing the funds on some equitable basis throughout the entire district. Moreover, if by reason of the reorganization supplemental tax revenues were needed, the New Board would have to develop a new uniform tax rate to be assessed in the district that takes into account the different operating expenses and indebtedness of the existing school districts. The Board also would have to resolve the problems caused by teachers with similar qualifications in different districts who are paid at different salaries and represented by different bargaining representatives.

As the central governing board for the new district, the New Board also would have to develop and implement a new administrative structure for the public schools in the eleven existing districts. Undoubtedly, this would require substantial changes

---

**33.** Several of the school districts have suggested that Paragraph 11 of the mandate of the Third Circuit provides for a stay of this case pending disposition of the writ of certiorari. Paragraph 11 is almost a verbatim restatement of Paragraph 10 of the Order of June 15, 1976. The Third Circuit language adds only "VI C," thereby specifying the portion of the May 19, 1976 Opinion where the three-judge court provided for a stay of the implementation of its plan. The interpretation suggested by defendants was considered by the Court in connection with an earlier application for stay. (Doc. 506) Although at that time the issue involved exclusively the Order of June 15, 1976, the disposition made there is equally applicable to the instant argument. Transcript of Argument held on May 5, 1977, pp. 10–14, 82.

**34.** Docs. 510, 512, 513.

**35.** Affidavit of Howard E. Row (Doc. 512) at 4–5.

in the present hierarchy and decision-making procedures. If the Supreme Court were to vacate or reverse the judgment of the Third Circuit, school administrators very likely would have to unscramble all that had occurred pursuant to the Third Circuit mandate.

Finally, the New Board must develop a pupil assignment plan that desegregates the public schools of Northern New Castle County. Approximately 60,000 school children are affected by this litigation. Lasting harm would be done to the education of these children if they must endure the turmoil and uncertainty involved in reorganizing into one district and then must undergo the rigors of disestablishing the district if the defendants' petition to the Supreme Court were successful. There very likely also would be substantial disruption of teaching assignments,[36] and potential curriculum hiatus for students because not all districts have identical course offerings.

■ Although each individual item described above may not constitute irreparable injury, when viewed as a whole, it is concluded that the defendants have shown that implementation of the one-district plan will cause irreparable injury if their petition is subsequently successful. Proof of irreparable injury is insufficient, however, to sustain a motion for stay, if the appeal is unlikely to be successful as that language is hereafter defined [37] or, when taken together, it cannot be said to outweigh the harm

36. Id. at 3.

37. Infra p. 843 et seq.

38. See Evans v. Buchanan, 424 F.Supp. 875, 879 (D.Del.1976).

39. See A. O. Smith v. FTC, 530 F.2d 515, 525 (3d Cir. 1976).

40. An examination of the source of the present standard further buttresses this conclusion. The test originally was formulated in Virginia Petroleum Jobbers Ass'n v. Federal Power Commission (FPC), 104 U.S.App.D.C. 106, 259 F.2d 921, 925 (1958). See Wright & Miller, Federal Practice and Procedure: Civil § 2904. Significantly, Virginia Petroleum Jobbers did not involve a stay of a district court proceeding. The Association in that case sought in the

to the plaintiffs and to the public interest caused by entry of the stay.

**B.** *Strong Showing on the Merits*

■ According to the test accepted by virtually all courts, including this one,[38] one seeking a stay pending appeal on disposition of writ of certiorari must make "a strong showing that he is likely to succeed on the merits of the appeal." *Reserve Mining Co. v. United States, supra,* 498 F.2d at 1076. Although this standard is similar to one of the tests for issuance of a preliminary injunction,[39] the posture of a case is significantly different when preliminary injunctive relief is sought from when a stay is requested. In the former, the Court has not ruled on the merits of the case and need only make an initial determination of the reasonable probability of the applicant's eventual success. *See A. O. Smith v. FTC,* 396 F.Supp. 1108, 1119 (D.Del.1975). In the latter, the Court has issued its determination, after a full consideration of the merits. The above-quoted standard would seem to require that a district court confess to having erred in its ruling before issuing a stay.

■ Common sense dictates that a literal reading of the standard would lead most probably to consistent denials of stay motions, despite the immediate threat of substantial irreparable injury to the movant. The almost inescapable conclusion is that the standard cannot mean what its language would indicate.[40]

Circuit Court of Appeals both an injunction pending appeal and to stay an administrative proceeding by the Federal Power Commission. The Court of Appeals understandably required a strong showing of the Association's likelihood of success of its appeal before it would disrupt the normal operation of the administrative process. *Virginia Petroleum Jobbers Ass'n v. FPC, supra,* 259 F.2d at 925. Moreover, the stay was sought pending complete review of certain other, related FPC proceedings by the Court of Appeals. Thus, the application for a stay was not only almost identical to an application for a preliminary injunction but was considered simultaneously with a request for an injunction. The Court of Appeals logically applied tests very similar to those applicable to a preliminary injunction. But a motion for a stay filed after hearing, decision, judgment, ap-

A more reasonable interpretation can be developed by analyzing the policy underlying its inclusion as a criterion for issuance of a stay. In a case where the movant will suffer irreparable injury in the absence of a stay, consideration of the merits of the movant's appeal permits an evaluation of whether that injury is likely to occur in any event. It seems illogical, however, to require that the court in effect conclude that its original decision in the matter was wrong before a stay can be issued. Rather, a stay may be appropriate in a case where the threat of irreparable injury to the applicant is immediate and substantial, the appeal raises serious and difficult questions of law in an area where the law is somewhat unclear and the interests of the other parties and the public are not harmed substantially. This is not to say, however, that every time a case presents difficult questions of law a stay should be entered. As noted earlier, the four factors must be viewed together and the interest of the movant balanced against the interests of the other parties and the public. It is the duty of the court to exercise its discretion so that an equitable resolution is achieved. In the instant case, the court must now examine the questions raised by the certiorari petition to the Supreme Court and the clarity of the law in the area of school desegregation to determine whether the defendants have met their burden.

The defendants cite numerous discrete issues as the basis for their certiorari petition. These various issues, however, can be distilled to one fundamental dispute between the parties: each side has characterized this current phase of the *Evans v. Buchanan* litigation radically differently.

The plaintiffs contend that this is and has been a "remedy" case, not a "violation" case. That is, what prompted the filing of an amended complaint in 1971 was the failure of the defendants to dismantle the interdistrict *de jure* segregation which had been found to exist in Delaware at the time of *Brown v. Board of Education (Brown I).*[41]

The long process of desegregating the public schools of Delaware began in the State court system over 25 years ago.[42] The State court decisions were affirmed in one of the companion cases to *Brown I.* Two years later litigation was instituted in this Court to seek compliance with the mandate of *Brown I* and *Brown II.*[43] Plaintiffs submit that compliance simply has never been accomplished.

Plaintiffs emphasize the finding of the three-judge court that the *de jure* system in effect in 1954 was a "cooperative venture involving both city and suburbs." *Evans v. Buchanan, supra,* 393 F.Supp. at 437. Further, that interdistrict *de jure* system was never completely eradicated. *Id.* at 437–38; *Evans v. Buchanan, supra,* 416 F.Supp. at 341 n. 43. Under this theory, the issue before the three-judge court was not whether a new *de jure* segregated educational system had been established, rather it was whether the State of Delaware had discharged its affirmative duty to desegregate the schools of northern New Castle County. *See Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). Plaintiffs further assert that various additional violations found by the three-judge court constitute separate, independent constitutional violations and were also in furtherance of perpetuating the dual school system which has not been dismantled.

By contrast, the defendants urge that the only segregation which the district court found had not been remedied since *Brown I*

peals, and issuance of mandates is vastly different. It is therefore concluded a motion to stay in this procedural context cannot be approached in the same manner that a court treats a motion for preliminary injunction.

41. 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

42. *Belton v. Gebhart,* 32 Del.Ch. 343, 87 A.2d 862 (1952); *Gebhart v. Belton,* 33 Del.Ch. 144, 91 A.2d 137 (1952).

43. *Brown v. Board of Education,* 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955).

was in the Wilmington School District. *See Evans v. Buchanan, supra,* 379 F.Supp. at 1223. The defendants point out that the district court expressly noted that no evidence had been introduced to show that the suburban districts were not operating unitary school systems and that there was an express finding that the Wilmington and suburban districts have largely acted independent of each other. *Evans v. Buchanan, supra,* 393 F.Supp. at 437, n. 19. Therefore, the defendants argue that an interdistrict remedy is inappropriate in this case absent a finding that the defendants have erected a new dual school system which has interdistrict effects. Moreover, the defendants contend that the findings of constitutional violations articulated in the three-judge court's March 27, 1975 Opinion [44] provide an inadequate basis for entering an interdistrict remedy because those findings as to discriminatory intent and incremental segregative effect do not comply with the requirements set out by the Supreme Court in recent race discrimination cases. *See, e. g., School District of Omaha v. U. S.,* — U.S. ——, 97 S.Ct. 2905, 53 L.Ed.2d 1039 (1977); *Brennan v. Armstrong,* — U.S. ——, 97 S.Ct. 2907, 53 L.Ed.2d 1044 (1977); *Dayton School Board of Education v. Brinkman,* — U.S. ——, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977); *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). Defendant State Board does concede, however, that if plaintiffs' characterization is correct, the findings of the three-judge court with respect to discriminatory intent and incremental segregative effect are adequate. (Hearings Tr. 920).

These competing characterizations do raise vexing legal questions. This Court has no difficulty in concluding that the three-judge court was correct in its rulings. Rather, what is troublesome is that the summary affirmance by the Supreme Court in this case preceded the decisions in all of the cases heavily relied upon by the defendants. Thus, the concern is whether and to what extent the principles expressed in those subsequent decisions have any application to a case such as this where the trier of fact found that the vestiges of an interdistrict *de jure* segregated school system had not been completely dismantled.[45] *Cf. Corpus Christi School District v. Cisneros,* 404 U.S. 1211, 92 S.Ct. 9, 30 L.Ed.2d 15 (1971) (Black, Circuit Justice).

Moreover, there are complicating factors which this Court must consider in evaluating whether the defendants have made a showing sufficient to warrant entry of a stay. The three-judge court in this case issued two opinions on the question of whether the State Board and other intervening defendants were guilty of constitutional violations. *Evans v. Buchanan, supra,* 379 F.Supp. 1218; *Evans v. Buchanan, supra,* 393 F.Supp. 428. The Order entered pursuant to those opinions was summarily affirmed by the Supreme Court. *Evans v. Buchanan, supra,* 423 U.S. 963, 96 S.Ct. 381, 46 L.Ed.2d 293 (Rehnquist, J., joined by Burger, C. J. and Powell, J., dissenting). Subsequently, the three-judge court issued an Opinion on the remedy to be imposed to redress the violations. *Evans v. Buchanan, supra,* 416 F.Supp. 328. This ruling was affirmed with modifications by the Third Circuit in a 4 to 3 decision. *Evans v. Buchanan, supra,* 555 F.2d 373. Against this background must be juxtaposed the continued active interest displayed by the Supreme Court in school desegregation cases.[46]

**44.** *Evans v. Buchanan,* 393 F.Supp. 428 (D.Del. 1975).

**45.** In my opinion, those cases do not apply to the instant case. I recognize, however, that in the procedural posture of this case, it is not my opinion that counts, but rather that of the Supreme Court. Further, if those cases were applicable, the three-judge court made all the subsidiary findings with respect to discrimina-

tory intent and incremental segregative effect (unless that phrase is to mean precise mathematical percentage) that the record permits without resort to sheer speculation.

**46.** A review of such cases considered by the Supreme Court for the 1976–77 term reveals that the Court has subjected to close scrutiny decisions finding extensive constitutional violations or decisions in which comprehensive rem-

Indeed, the Third Circuit rendered its decision in this case prior to the issuance of three of the most recent Supreme Court decisions. *Dayton School Board of Education v. Brinkman, supra; District of Omaha v. United States, supra; Brennan v. Armstrong, supra.*[47] This is not to say that the subsequent Supreme Court decisions would have changed the conclusion of the Court of Appeals. At least, however, the Circuit Judges would have had the benefit of the most recent Supreme Court reasoning in this difficult area of the law and been able to interpret the cryptic and summary dispositions of earlier cases in light of the subsequent more extensive discussions. *See, e. g., Board of School Commissioners of City of Indianapolis v. Buckley,* 429 U.S. 1068, 97 S.Ct. 802, 50 L.Ed.2d 786 (1977).[48]

These "complicating" factors do not bear directly on the issue of the probability of the defendants' petition being successful, as

edies for such violations have been ordered. Certiorari was granted in 6 of 13 cases involving school desegregation-related issues. In five of those six cases, all of which involved findings of constitutional violations or implementation of comprehensive remedies, the Supreme Court vacated and remanded the lower court decision. These include *Brennan v. Armstrong,* — U.S. ——, 97 S.Ct. 2907, 53 L.Ed.2d 1044 (1977) (per curiam); *School District of Omaha v. United States,* — U.S. ——, 97 S.Ct. 2905, 53 L.Ed.2d 1039 (1977) (per curiam); *Dayton School Board of Education v. Brinkman,* — U.S. ——, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977); *Board of School Commissioners of City of Indianapolis v. Buckley,* 429 U.S. 1068, 97 S.Ct. 802, 50 L.Ed.2d 786 (1977) (vacated and remanded in light of *Village of Arlington Heights v. Metropolitan Housing Development Authority,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) and *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)); and *Austin Independent School District v. United States,* 429 U.S. 990, 97 S.Ct. 517, 50 L.Ed.2d 603 (1976) (vacated and remanded in light of *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)). The issue in *Milliken v. Bradley,* — U.S. ——, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977), the only Supreme Court decision affirming a lower court decision granting remedial relief, did not concern a comprehensive desegregation plan, but was limited to the propriety of compensatory educational programs as a desegregation remedy.

Of the remaining seven cases, one was the appeal from the three-judge court Order of June 15, 1976 in this case, which was dismissed for want of jurisdiction. *Delaware State Board of Education v. Evans,* 429 U.S. 973, 97 S.Ct. 475, 50 L.Ed.2d 579 (1976). In the remaining six cases, certiorari was denied. None of the six involved findings of extensive constitutional violations, and only one concerned the propriety of a comprehensive desegregation remedy. *Board of Education of Jefferson County v. Newburg Area Council, Inc.,* 429 U.S. 1074, 97 S.Ct. 812, 50 L.Ed.2d 792 (1977) (no abuse of discretion in remedying all vestiges of state-imposed segregation by requiring implementation of busing plan insuring that each elementary school in 20% black school system has black enrollment of between 12 and 40% and each secondary school of between 12.5 and 35%). Two of the cases were limited to discrete issues relating to remedies. *McDonough v. Morgan,* 429 U.S. 1042, 97 S.Ct. 743, 50 L.Ed.2d 755 (1977) (no abuse of discretion in appointment of temporary receiver to insure compliance with desegregation plan); and *Cuthbertson v. Charlotte-Mecklenburg Board of Education,* 429 U.S. 831, 97 S.Ct. 92, 50 L.Ed.2d 95 (1976) (complaint challenging pupil assignment based on race properly dismissed when assignments are product of remedial phase of school desegregation action). In one of the cases, no constitutional violation was found. *Board of Education of Independent School District No. 53 v. Board of Education of Independent School District No. 52,* 429 U.S. 894, 97 S.Ct. 253, 50 L.Ed.2d 176 (1976). The remaining two cases in which certiorari was denied presented procedural questions in conjunction with desegregation consent decrees. *St. Louis Board of Education v. Caldwell,* — U.S. ——, 97 S.Ct. 2987, 53 L.Ed.2d 1100 (1977) (intervention); and *Young v. Midland Independent School District,* 430 U.S. 983, 97 S.Ct. 1680, 52 L.Ed.2d 378 (1977) (mandamus).

**47.** Although *Omaha* and *Brennan* were per curiam dispositions, all three decisions resulted in vacations and remands.

**48.** The Indianapolis case appears at first glance to be similar to the case at bar. Both courts found that virtually all the public housing projects had been built within the city limits of Wilmington and Indianapolis. *See United States v. Board of School Commissioners of City of Indianapolis,* 541 F.2d 1211, 1222 (7th Cir. 1976). Further, there is a rough analogy, in terms of their effects on the city schools, between the Uni-Gov plan enacted by the Indiana legislature and the Educational Advancement Act. *See id.* at 1220–22. But there also is a critical distinction between the two cases. Here, unlike Indianapolis, the three-judge court found that *de jure* segregation had existed on an interdistrict basis prior to *Brown v. Board of Education, supra. Cf. id.* at 1227 (Tone, J., dissenting).

that standard has been interpreted above. They serve only to emphasize that the certiorari petition does present substantial and difficult questions of law. In light of the difficulty of the issues presented, the developing nature of the law in this area as applied to the instant case (and the apparently concerted effort by the Supreme Court to foster this development), and the threat of irreparable injury described earlier, it is concluded that the defendants have made the showing necessary to warrant entry of a stay, unless that showing is outweighed by the harm to the plaintiffs or to the public.

## C. Harm to the Plaintiffs

The obvious and irreparable harm that the individual plaintiffs would suffer from entry of a stay is the continued delay in the vindication of their constitutional right to attend a unitary school system. The intervening Wilmington School Board similarly would be prevented from administering a unitary system. This Court has noted in the context of an earlier stay motion how serious it considers this injury.[49] Nevertheless, one factor mitigates this harm in some measure.

Plaintiffs do have the opportunity under the liberalized provisions of the voluntary transfer program to attend any other school system in the county except DeLaWarr.[50] This Court does not deem this option to be an adequate remedy to the constitutional violations found by the three-judge court. The program, however, does provide an opportunity for students so inclined to attend another school system already found to be unitary within itself. See Evans v. Buchanan, supra, 393 F.Supp. at 437, n. 19.[51]

When the conceded injury to the plaintiffs, viewed in light of this factor, is weighed against the showing made by the defendants of irreparable injury and the existence of substantial and difficult ques-

tions of law in this complicated and sensitive area of the law, the balance is a close one. Before resolving it, attention must be addressed to the final factor—the public interest.

## D. Public Interest

The fourth factor to be evaluated in ruling on the motion for a stay is the public interest. Obviously, the individual plaintiffs are part of the public. Further, it cannot be gainsaid that every school child, white or black, should have the right to attend a unitary school system. The effects of de jure segregation are felt keenly by white students, although perhaps not as severely as black students feel them. But this does not end the analysis, for there are other considerations.

One is the interest of the public in a stable educational system. The right to attend a unitary school system is in part an end in itself, mandated by the Constitution. It is also, however, grounded in the premise that the educational interests of a child are best served by going to a desegregated school. The interests of a child, black or white, are not served, however, by subjecting his educational experience to the uncertainties of the judicial process. There can be little doubt of the significant disruption, both personally and educationally, that would occur if the one-district plan were reversed after implementation had begun. It is a cost incapable of accurate measurement, but it must be considered, however, crudely, in this Court's balancing process.

A related but distinct factor is the interest of the public in certainty. No one need be reminded of the sensitivity and social importance of the issues at stake in this litigation. Part of the tension and uneasiness that has afflicted this community during the past several years derives from the uncertainty about the practical effect this

---

49. Transcript of Argument Held May 5, 1977 at 83–85.

50. As noted earlier, the liberalizing amendments to the transfer statute apply only to the 1977–78 school year.

51. See supra at 837 n. 14 for an account of the number of students who have elected to transfer under the voluntary program.

litigation would have on each individual's life. As with many other aspects of life, the uncertainty is very often more trying than dealing with the final result, no matter what that may turn out to be. It is quite clear that certainty in this case means a final disposition by the Supreme Court, either to deny or to grant the writ of certiorari and if the latter, hopefully, a decision on the merits. The grant of a stay may not affect directly the public's interest in certainty, but the denial of a stay does increase public uncertainty because of the possibility of a subsequent reversal or vacation. While this interest in a final resolution like the others referred to above is not dispositive of the stay question, this Court must weigh its importance in arriving at a conclusion.

### E. Conclusion

When the showing of irreparable injury and the merits of their appeal made by defendants is weighed against the harm to the plaintiffs and the interest of the public, the result is, not surprisingly, an exceedingly close question. I conclude, however, on the basis of the particular facts and considerations recited in this opinion, that a limited stay is warranted at this time. It is emphasized that this decision is not reached because of the administrative problems the State Board has stated would make very difficult the implementation of a one-district plan this fall. After having 14 months to develop a plan for the transition to a one-district school system, this Court is scarcely impressed by such protestations.

I believe that a stay of implementation of the one-district plan for grades 7 through 11 is justified, pending disposition of the writ of certiorari by the Supreme Court.[52] Necessarily, therefore, the transfer of authority to the New Board and the abolition of the 11 school districts also will be stayed. But that is all that will be stayed.

The State Board will be ordered to appoint the members of the New Board forthwith and to submit those names to the Court no later than August 10, 1977. Consistent with this Opinion and the mandate of the Third Circuit, the New Board will be authorized to retain counsel to represent it in these proceedings and will be ordered to begin immediate development of a plan to desegregate grades 1 through 11 in the public schools of the 11 affected districts in September, 1978, and grades 1 through 12 in all subsequent years. The plan shall include both pupil and faculty assignments as well as the administrative hierarchy based on the one-district plan approved by the Court of Appeals. *Evans v. Buchanan, supra,* 555 F.2d 373. For the reasons expressed in the May 19, 1976 opinion of the three-judge court, rising seniors will be exempted from the plan during the first year of implementation. *See Evans v. Buchanan, supra,* 416 F.Supp. at 360. Similarly, the discrete groups of students exempted from any desegregation plan by the three-judge court will not be included in the plan developed by the New Board. *Id.* at 360–61.

Further, pursuant to that mandate, the State Board of Education, the Department of Public Instruction and the school districts shall provide the New Board with whatever technical or other assistance the New Board deems necessary[53] and shall assign its highest priority to this responsibility. If any further extension or modification of the order of this Court entered pursuant to the mandate of the Third Circuit is necessary to carry out this responsibility, the State Board shall so inform the Court at the earliest possible moment. The New Board shall retain whatever experts or other support personnel it requires to complete its task. All expenses generated by the New Board shall be paid by the State Board and the existing school districts as

---

**52.** Because of the disposition of this stay motion, references to September or fall 1977 in the Order of this Court entered on May 19, 1977 pursuant to mandate of the Third Circuit should be considered extended until further order of this Court.

**53.** This includes delivering to the New Board any reports or other documents developed by the Interim Board during its existence.

provided in the mandate of the Third Circuit. The New Board shall file with the Court every two weeks beginning on August 19, 1977, a report on its progress. The report also shall state any problems the New Board has encountered where it believes the Court may be of assistance and shall detail the reasons for not seeking appropriate relief by motion.

The mandate of the Third Circuit contemplates that the New Board will be responsible for developing the desegregation plan and that the State Board primarily will draw up a time-table for the smooth transfer of authority to the New Board. These tasks are too inter-related, however, to permit each to proceed without close coordination with the other. Further, the mandate of the Third Circuit expressly requires the New Board to consider any planning necessary for the transfer of power to it. Accordingly, the New Board shall submit its proposed plan to the State Board and Department of Public Instruction for professional evaluation and comments on its practical implementation. After receipt of that analysis, the New Board and State Board shall confer extensively and intensively to seek resolution of their differences. If no resolution is reached, the New Board shall submit its plan to the Court with a specification of the existing differences and reasons in support of its position. The State Board also shall specify its disagreement with the proposed plan and the reasons in support of its position. Both the plan and the list of differences and competing positions shall be filed no later than September 30, 1977.

Similarly, the State Board shall submit to the New Board its proposed time-table for the transfer of authority. After receipt of the New Board's comments, the two boards shall confer closely to resolve any differences. If any or all of the differences are not settled, the State Board shall submit to the Court its proposed time-table together with a list of the existing differences and the reasons for the position it has taken. The New Board also shall submit such a list and the reasons in support of its position. These submissions shall be made no later than September 30, 1977. Hearings on the New Board's plan and the State Board's time-table shall commence on October 18, 1977, unless the Supreme Court grants certiorari in the interim.[54]

The stay granted herein shall remain in effect until the Supreme Court has acted on the defendants' petition and for such time thereafter as the Court shall deem necessary, after considering the recommendation of the New Board, to accomplish the transition to a one-district unitary school system. Of course, if the Supreme Court grants the petition for writ of certiorari, the stay granted herein would continue in effect.

All provisions of the mandate, except those specifically stayed by this Opinion and accompanying Order shall remain fully in effect.

---

54. The Court is aware that as of October 18, the Supreme Court may have taken no action on the defendants' petition. Nevertheless, on balance, given the history of the fourteen months since the three-judge court remedy opinion and what was not accomplished during that interval, it is obvious the task of dismantling the dual school system found to exist by the three-judge court can only be accomplished by vigorous pursuit of an appropriate remedy.