Brenda EVANS et al., Plaintiffs,

v.

Madeline BUCHANAN et al., Defendants.

Civ. A. Nos. 1816–1822.

United States District Court, D. Delaware.

March 15, 1978.

**1042**

Joseph A. Rosenthal, and Irving Morris, of Morris & Rosenthal, and Louis L. Redding, Wilmington, Del., for individual plaintiffs.

Richard Allen Paul, of Paul, Lukoff & Hurley, Wilmington, Del., for intervening plaintiffs; Louis R. Lucas, Ratner, Sugarmon, Lucas, Salky & Henderson, Memphis, Tenn., Paul R. Dimond, of O'Brien, Moran & Dimond, Ann Arbor, Mich., William L. Taylor, Center for National Policy Review, Washington, D. C., of counsel.

Aida Waserstein, Wilmington, Del., for intervening Hispanic plaintiffs.

Richard R. Wier, Jr., Atty. Gen., State of Delaware, and Regina M. Small, Asst. Atty. Gen., State of Delaware, William Prickett, and Mason E. Turner, Jr., of Prickett, Ward, Burt & Sanders, Wilmington, Del., Philip B. Kurland, Chicago, Ill., for defendant State Bd. of Ed.

Edward W. Cooch, Jr., of Cooch & Taylor, Wilmington, Del., for Marshallton-McKean School Dist.

Samuel R. Russell, of Biggs & Battaglia, Wilmington, Del., for Alexis I. duPont School Dist.

William Poole, of Potter, Anderson & Corroon, Wilmington, Del., for Alfred I. duPont School Dist.

James T. McKinstry, of Richards, Layton & Finger, Wilmington, Del., for Claymont and Stanton School Districts.

John P. Sinclair, of Potter, Anderson & Corroon, Wilmington, Del., for Newark School Dist.

Jerome O. Herlihy, of Herlihy & Herlihy, Wilmington, Del., for Conrad Area School Dist.

Howard M. Handelman, and Jeffrey M. Weiner, of Bayard, Brill & Handelman, Wilmington, Del., for New Castle County Vocational-Technical School Dist.

James M. Tunnell, Jr., and Richard Allen, of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for Mount Pleasant School Dist.

David Anderson, of Potter, Anderson & Corroon, Wilmington, Del., for New Castle-Gunning Bedford School Dist.

Thomas S. Lodge, of Connolly, Bove & Lodge, Wilmington, Del., for DeLaWarr School Dist.

Henry N. Herndon, Jr., and Edward M. McNally, of Morris, James, Hitchens & Williams, Wilmington, Del., for New Castle County Planning Bd. of Ed., a non-aligned party.

Leonard L. Williams, and George E. Evans, Wilmington, Del., for Wendell Howell, member of New Castle County Planning Bd. of Ed.

Sheldon N. Sandler, of Bader, Dorsey & Kreshtool, Wilmington, Del., amicus curiae, Delaware State Ed. Assn.

Clifford B. Hearn, of the law firm of Balick & Hearn, P.A., Wilmington, Del., amicus curiae, Wilmington Federation of Teachers AFT AFL–CIO.

## OPINION

MURRAY M. SCHWARTZ, District Judge.

Presently before the Court are two motions: a "Motion for Injunction Pendente Lite"[1] filed by the New Castle County Planning Board of Education ("NCCPBE") and a "Motion that the Court Modify its Order of January 9, 1978"[2] filed by defendant Delaware State Board of Education ("State Board").[3] The subject matter to which both motions relate are Delaware Senate Bill 456 and the "Plan for the Reorganization and Desegregation of Designated School Districts in New Castle County, Delaware" ("Four District Plan") passed pursuant thereto. In essence, the NCCPBE seeks to preliminarily enjoin any efforts towards implementation of the Four District Plan until final resolution of the State Board's Motion. The State Board desires the Court to modify a previous Order in this case to embody the Four District Plan.

This Opinion, constituting the Findings of Fact and Conclusions of Law necessary pursuant to F.R.Civ.P. 52 and the reasons in support of issuance of a preliminary injunction pursuant to F.R.Civ.P. 65, reaches two principal conclusions: (1) a preliminary injunction must be granted because the relevant criteria for issuance are abundantly fulfilled; and (2) the Court at the present time lacks jurisdiction to entertain the State Board's motion. Further, if the State Board's motion is considered as a motion seeking to have the Court indicate to the Third Circuit Court of Appeals its willingness to take additional evidence, to the extent the Court is so empowered, that motion will be denied.

## I. NCCPBE's Motion for a Preliminary Injunction

### A. Current Procedural Background

On January 9, 1978, after hearings,[4] this Court entered a final order[5] in this school desegregation case. Over the objections of defendant State Board of Education and defendant predominantly white districts which argued that the desegregation area lacked the capacity to support a 9–3 pupil assignment plan,[6] the Court ordered the NCCPBE to proceed forthwith in developing a 9–3 plan. Advising only that the NCCPBE fully avail itself of the flexibility afforded by a single district and mandating certain minimal guidelines, the Court announced its view that details of the desegregation plan and its underlying educational objectives were within the purview of the NCCPBE and not that of the Court.

Following the Court's January 9 Order, defendant State Board and other defend-

---

1. Doc. 732.

2. Doc. 730.

3. A third motion requesting an "Order to Show Cause why all Parties should not be Enjoined From Taking Any Action . . . Contrary to January Orders" has been filed by plaintiffs. Doc. 731. This motion need not be presently considered because of the disposition made with respect to the NCCPBE's motion. Subsequent to filing their motion, plaintiffs endorsed orally and in writing the motion of the NCCPBE.

4. Daily hearings were held from October 18 to November 8 and from November 29 to December 6, 1977 to first consider the 10–2 plan of the NCCPBE and plaintiffs' Plan W and thereafter to evaluate the feasibility of a 9–3 plan.

5. On January 20, 1978, upon motion of the NCCPBE for modification and clarification, an additional order was entered. This litigation spanning over twenty years has generated many orders and opinions, a partial listing of which is found in *Evans v. Buchanan*, Nos. 1816–1822, 447 F.Supp. 982 (D.Del., filed Jan. 9, 1978), Slip Op. at n.1.

6. A 9–3 plan refers to the concept whereby students from the predominantly black districts attend school in the predominantly white districts for 9 years and students from the predominantly white districts attend school in the predominantly black districts for 3 years.

ants lodged a timely appeal with the Third Circuit, which granted an expedited briefing schedule and an en banc hearing scheduled for May 11 or 12, 1978. Meanwhile, the NCCPBE, which had stressed it was fully prepared to implement the Court's Order, continued to plan for desegregation. This represented a continuation of the NCCPBE's efforts since appointment in August 1977 to make desegregation a reality by September 1978. The NCCPBE hired a superintendent for the single district and made appointments to other key posts within the central administration. It also timely set a school tax rate on February 23, 1978 for the fiscal year commencing July 1, 1978. Further, the task forces responsible to the NCCPBE were deployed in a manner consistent with the Order. For example, the Pupil Assignment Committee undertook the task of assigning every student to a particular school, a job conservatively estimated to take eight weeks and not yet completed. Incident to the work of that Committee is the task undertaken by the Committee on School Closings which has been visiting and evaluating school facilities throughout the desegregation area to determine which schools should be closed.[7] The Curriculum Committee of some seventy persons conducted an inventory of the resources available to the one district and constructed a core curriculum. On the administrative front, an area wide election was held to determine the teachers' choice of a collective bargaining agent. In summary, biweekly reports[8] filed by the NCCPBE with the Court reflect substantial progress towards a one district school system.

In mid-February, well after planning for one district was underway, the Delaware Legislature enacted legislation, Senate Bill 456, approving a four district reorganization for the desegregation area. On February 17, defendant State Board pursuant to that legislation moved that the Court amend its January 9 Order, providing for one district under the control of the NCCPBE, by eliminating the NCCPBE and substituting four autonomous districts administered by four separate school boards.

## B. Current Factual Background

The action by the Legislature came significantly later than would have been expected by the Court or, for that matter, by anyone remotely familiar with the case. That the courts have repeatedly implored the Legislature to speak its will is abundantly evident from prior opinions issued in this case. In May 1976, the three-judge court announced that a single district plan would be effective as of September 1977, absent appropriate legislative action. The Legislature declined to act. A year later in May 1977, when the Third Circuit reviewed the order of the three-judge court it provided sixty days within which State authorities could redress the constitutional violation and fashion an appropriate governance plan.

"[W]e do not mandate any specific number of districts which the state may create within the area presently encompassed by the defendant districts nor do we require that all existing districts be reconstituted. We do caution that a 'Wilmington only' plan will not be adequate. We add one additional provision. We shall require State authorities to file with the district court within 60 days from [May 18, 1977] a formal report of its efforts to carry out the mandate of the district court."

555 F.2d at 381. No plan for either governance or pupil assignment was submitted by the State within the 60-day period. In-

---

7. The need to close some schools has been abundantly evident as a result of a decline in the number of school-age children.

8. *See, e. g.*, Doc. 754; Doc. 734; Doc. 729; Doc. 722; Doc. 701; Doc. 659; Doc. 639; Doc. 624; Doc. 604; Doc. 600; Doc. 576.

deed it is difficult to consider one without the other.[9]

Because of pending certiorari applications to the Supreme Court,[10] implementation scheduled for September 1977 was postponed until September 1978.[11] In the interim, this Court, over four weeks in October, November and December, heard extensive testimony on pupil assignment plans suitable to a one district plan.[12] One of the principal themes dominating these hearings was the need for stability and certainty in the community. Thus all parties urged an early determination by the Court. At all times during the course of these proceedings, an effort was made to apprise the Legislature so "that there [would] be no misunderstanding as to the Legislature's state of knowledge at any particular point in time." [13] Prior to issuance of the Court's January 9 Order, the Legislature again met to reconsider its stance and decided to recess without taking any action.

Acknowledging that "the Court, speaking generally, has, from the time it handed down its original decision, left considerable latitude for the Legislature to act if it wished," [14] the State Board during the fall hearings conceded that the longer the Legislature waited to act the greater the number of practical problems created.[15] It is an understatement to say that when the Legislature acted in mid-February 1978, almost two years after the invitation of the three-judge court, it created practical problems.

---

**9.** The prior opinions in this matter never contemplated or mandated a change in governance scheme independent of a remedy for the constitutional violation. It was recognized that the form of governance must be tailored to accommodate the desegregation remedy. Thus, the three-judge court in its primary remedy opinion stated:

> "*The reorganization* plans submitted by various parties propose *correcting the prior violations* by redrawing the boundary lines found to have been drawn improperly. That is, they attempt to combine Wilmington and various of the suburban districts into new consolidated districts. It is expected that the populations of these districts will reflect the racial character of the area as a whole, and that *following the effectuation of the remedy, the new districts could assign pupils within their localities on a desegregated basis* and otherwise operate a unitary system."

416 F.Supp. at 348 (footnote omitted, emphasis added). At page 351 the same court stated: "[The three-judge court] will create a framework within which the State can make a future determination of proper districts for the area, *while insuring that actual desegregation will take place.*"

416 F.Supp. at 351 (emphasis added). The same court made clear reorganization was required only by reason of the necessity for an inter-district remedy for the constitutional violation:

> "As we have made clear, reorganization or *consolidation of some portion* of the existing districts is required, *since otherwise an inter-district plan would fail by reason of its administrative burden.*"

416 F.Supp. at 352 (emphasis added). Defendant's argument that Part IV of the Third Circuit majority opinion clearly distinguishes between remedy and governance and sanctions one without the other not only defies common sense, but ignores language prohibiting "Wilmington only" plans which clearly connects governance to remedy. Notwithstanding the preceding background and repeated pronouncements, some of which are detailed above, the Legislature and State Board have not to this date placed their imprimatur upon a remedy for the constitutional violation.

**10.** Certiorari was denied on October 3, 1977. 434 U.S. 880, 98 S.Ct. 236, 54 L.Ed.2d 160 (1977).

**11.** 435 F.Supp. 832 (D.Del.1977).

**12.** Guided by the earlier orders of a three-judge court, *Evans v. Buchanan,* 393 F.Supp. 428 (D.Del.1975), and 416 F.Supp. 328 (D.Del.1976), and the Third Circuit, *Evans v. Buchanan,* 555 F.2d 373 (3d Cir. 1977), *cert. denied,* 434 U.S. 880, 98 S.Ct. 236, 54 L.Ed.2d 160 (1977), affirming a constitutional violation and approving consolidation of the eleven existing school districts in Northern New Castle County into one single district in the absence of timely responsible action by appropriate State authorities, the proceedings concentrated almost entirely on pupil assignment plans.

**13.** Doc. 695 O, at 158.

**14.** *Id.* 156.

**15.** *Id.* 166–78.

An element of uncertainty and confusion was added to a highly emotional subject already bewildering to even the best informed citizens of this area.

### C. Criteria for the Issuance of a Preliminary Injunction

■ The Court before granting a preliminary injunction must consider whether the movant is likely to prevail on the merits; whether the movant will suffer irreparable injury; whether the injunction substantially harms any party to the proceedings; and finally whether an injunction is in the public interest. *A. O. Smith v. F.T.C.,* 530 F.2d 515, 525 (3d Cir. 1976). Although one can question the utility of these criteria, *see* Leubsdorf, *The Standard for Preliminary Injunctions,* 91 Harv.L.Rev. 525 (1978), an injunction is a bold step and therefore especially when issued against a party who has not as yet been fully heard on the merits at trial an injunction must be employed most carefully and sparingly.

■ At times, a court must enjoin a party who has already been heard on the merits of his case. After an adjudication on the merits, a court retains jurisdiction to preserve and enforce its decree and consequently may issue an injunction when the status quo secured by a court's order is threatened. 9 *Moore's Federal Practice* ¶ 203.11, at 734 n.2. Consequently, the focus of the Court's inquiry at this stage may be considerably narrower than the multiple criteria relevant to a preliminary injunction, concentrating instead almost entirely on whether the action sought to be enjoined conflicts with its Order. In the circumstances of this case, either a comprehensive review employing the above criteria or a narrow review to maintain the status quo manifests that the criteria for a preliminary injunction are met.

In relation to a narrow review, a preliminary injunction is requested by the NCCPBE to halt efforts to implement the Four District Plan. The NCCPBE claims the Four District Plan is at variance with the Court's January 1978 Orders and that injunctive relief is necessary to preserve the sanctity of those rulings. Thus the central issue for decision is whether the Four District Plan conflicts with prior Orders of this Court.

■ Application of the criteria for a preliminary injunction also commences by evaluating conflicts between the two schemes. With regard to the criterion of probability of success, the likelihood that the NCCPBE would succeed in proving that the January 1978 Orders and the Four District Plan conflict is overwhelming. The issue is not whether a plan utilizing four districts could succeed in desegregating the public schools of Northern New Castle County. Rather, at this point the issue is whether the Four District Plan and the Court's Orders could proceed simultaneously in harmony. In the face of representations of defendant State Board that absent an injunction it will proceed to implement the Four District Plan, the Court concludes that an injunction is essential to prevent the utter chaos which would otherwise result. In moving for the injunction, the NCCPBE simply stated "four districts are not one district; four staff, teacher and student groups are not one; four separate tax rates are not one common tax rate, and a board which will cease to exist on April 15 cannot assume full responsibility for the single district on July 1."[16] At least this much is conceded by the Assistant State Superintendent of Public Instruction.[17] Accordingly, that a series of fundamental conflicts exists can scarcely be doubted.

This conclusion that the NCCPBE and plaintiffs are likely to prevail on the merits by showing conflicts is buttressed upon

---

**16.** Doc. 747, at 17.

**17.** Doc. 740, at 10.

more detailed examination. The proponents of the Four District Plan, appreciating the haste required to construct a workable scheme for implementation in September 1978, have proposed that four interim school boards replacing the NCCPBE be sworn in by March 1, 1978; that "as promptly as possible" thereafter, the boards appoint superintendents; that "no later than February 20, 1978, each of the existing districts estimate its need for teachers"; that no later than March 1, 1978, the interim boards "be advised of the names and present job assignments of all personnel assigned to the respective district" and that by March 7, the four interim boards schedule elections for determination of school employees' bargaining representatives.[18]

The plan also provides that a council of the four superintendents, once named, shall oversee the coordination of pupil assignment plans which "shall be presented to the State Board for approval no later than March 31, 1978." One cannot help but wonder how such a projection could be responsibly advanced. The Pupil Assignment Committee operating under the NCCPBE began work in early January and, although expected to complete its work in the near future, has not yet completed its task.[19] However much the results of that Committee can be engrafted upon the Four District Plan, a considerable degree of modification may be expected in that the Pupil Assignment Committee worked without the constraints of fixed boundaries and therefore had available the device of lateral transfers.[20] This device is eliminated under a four district scheme. Moreover, there is a likelihood bordering on a probability that the boundaries of the four proposed districts are not congruent with the four attendance areas with which the Pupil Assignment Committee worked.[21] Finally, given the considerable expertise brought to the job by the Pupil Assignment Committee, one must conclude that at best, the drafters of the Four District Plan underestimate the care and skill which must be directed to the important job of pupil assignment.

With regard to the matter of taxation, the January 9 Order of the Court, recognizing that citizens of this county must be informed of their responsibilities at the earliest possible date, established February 24 as the final date for announcement of a tax rate but urged the NCCPBE that a rate be set earlier if possible. After hearings and a "time consuming study," the NCCPBE set an aggregate tax rate of $1.97 on February 23. Under the Four District Plan, each of the four districts is to set a tax rate by March 24. Given that the NCCPBE was aware well in advance of the January 9 Order that the single district was the only scheme of governance and given that the determination of the tax rate depended on preparation of a single budget, it is difficult to envision how the March 24 date for the establishment of four rates could be met if even perfunctory attention were given to hearings and budget preparation.

This obviously unrealistic timetable has already proven impossible as most of these projects could not proceed without conflicting with the outstanding Order of the Court. Presumably the State's lawmakers were aware that under the Supremacy Clause of the United States Constitution the Four District Plan could not legally go forward without modification of the Court's

---

18. Doc. 730, at 15–18a.

19. Since the Pupil Assignment Committee is working under the direction of the NCCPBE, that Board will have to review the results of that Committee's work and thereafter make pupil assignment decisions.

20. Senate Bill 456, section 6, expressly prohibits attendance at a school outside of the geographical boundaries of one's district.

21. The probability arises because for reasons not apparent of record the proposed Four District Plan obviously gerrymandered the Wilmington district.

decree.[22] A cursory look at the plan and legislation suggests that fairly protracted hearings on a Four District Plan reasonably could have been expected, with activity on the plan postponed until the termination of those hearings. At this stage, the conclusion must be that the movant's probability of success on the merits is overwhelming.

■ The possibility of protracted hearings and concomitant delay leads to the second criterion relevant to issuance of a preliminary injunction, whether irreparable injury would be suffered in the absence of relief. The issue in this regard is the likelihood that the desegregation effort would be impaired as a result of the conflicts, certain and potential, between the Court's Orders and the Four District Plan. At this point, the Court can conclude only that the possibility of impairment is great and the likelihood of irreparable injury substantial.

If hearings on the Four District Plan were conducted, the plan's proponents would have to demonstrate both that it did not impede the desegregation effort and that it was capable of effective implementation by September, 1978.[23] Adequate showings would have to be made with respect to both the governance scheme contemplated by the Four District Plan and the individual pupil assignment plans provided for each district. The inevitable conclusion in this regard is that if the Four District Plan is unsatisfactory in one of these aspects, irreparable injury will be suffered.

Because the single district was an assumed fact at the time, the inquiry of the four week hearings during the fall was essentially limited to the efficacy of pupil assignment plans. At those hearings, defendants expended considerable effort attempting to demonstrate that a 9–3 assignment plan was impossible in the single district because of capacity problems. From the evidence, it appeared to the Court that there was sufficient capacity. The Pupil Assignment Committee then was instructed to investigate the question using all the tools at its disposal including the flexibility provided by a single district. Because the Court could not conclude with "absolute certainty" that a 9–3 plan would work, however, it provided that "if . . . a 9–3 concept . . . is demonstrated to be unfeasible, the New Board may apply for relief from the pupil assignment component of the Order." [24]

The plan and legislation, which do not provide any independent pupil assignment remedy, apparently contain no reservations. Indeed, the Court is now urged by persons who vehemently argued that a 9–3 fit was impossible in one systemwide district, that a 9–3 plan is entirely possible in each of four districts despite capacity constraints resulting from the inability to cross district lines.[25] Presumably this miraculous conversion would be probed at some length during hearings on the Four District Plan.

Besides the feasibility of a 9–3 fit, other problems relating to pupil assignment ne-

**22.** The Supremacy Clause of the United States Constitution provides:

"This Constitution, and the Laws of the United States shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

U.S. Constitution Art. VI, cl. 2. Under the Supremacy Clause, "decisions of the subordinate federal courts on constitutional questions have the authority of the supreme law of the land and must be obeyed." *Bush v. Orleans*

*Parish School Bd.,* 188 F.Supp. 916, 925 (E.D. La.1960), *aff'd per curiam,* 365 U.S. 569, 81 S.Ct. 754, 5 L.Ed.2d 806 (1961). Senate Bill 457, passed in conjunction with the Four District Plan, reflects the Legislature has knowledge of the Supremacy Clause.

**23.** An additional problem could be posed by plaintiffs' challenge to the validity of the legislation under Delaware law.

**24.** Nos. 1816–1822, 447 F.Supp. 982, at 1008 (D.Del., Jan. 9, 1978).

**25.** Doc. 740, at 6.

cessitate extensive inquiry. The Four District Plan anticipates the assignment of pupils on a 9–3 basis but the implementing legislation, rather than providing the power to do so, specifically disclaims the Legislature as the source of power for this purpose.[26] Assuming arguendo that hurdle is scaled, it is expected from their pleading, filed in support of an injunction, that plaintiffs would be challenging specific pupil assignments in each of the districts to insure that, at a minimum, the schools in the predominantly black districts are properly utilized and children from those districts are not unnecessarily bussed or removed from neighborhood schools.[27] In addition, plaintiffs have suggested that a 9–3 pupil assignment scheme well may not be the appropriate remedy if the scheme of governance is four districts instead of one.

Assuming defendant State Board could demonstrate that a 9–3 fit were both possible and proper within each of the four districts, the existence and efficacy of an enforcement mechanism to coordinate the four districts must be demonstrated. The plan must insure that a full grade span including one high school within the predominantly black districts is provided in accordance with the Court's Order. At present, no sure method exists to compel one district to coordinate with another and no vested authority is empowered to resolve the impasse if no district is willing to exchange its primary school or high school students with those of the predominantly black districts.[28] These are only some of the pupil assignment problems presently indicating that the desegregation effort could be irreparably injured by the Four District Plan.

The parties will also have to confront not inconsequential challenges to the governance scheme. Under the Four District Plan, only the predominantly black district of Wilmington is divided. One obvious problem flowing from this structure is the assignment of staff from the Wilmington schools in a manner insuring the "schools do not retain their racial identity through racially identifiable faculty and staff assignments."[29] In addition, defendant State Board must insure ongoing and adequate representation by plaintiffs on the individual school boards to monitor implementation. That both these objectives are met under a Four District Plan must be substantiated upon examination.

Other areas which readily come to mind will generate more than a passing inquiry. Ancillary relief, taxation and allocation of costs are among them. In regard to ancillary relief, it must be demonstrated that the new boards, which have not participated in the planning process, possess the sensitivity and resources to develop adequate ancillary programs. The absence of an effective coordinating mechanism among districts may affect defendant's ability to insure that these necessary programs will go forward.

The subject of taxation creates its own special problems. Maximum tax rates were set for each of the proposed four districts. The current operating expense component of those maximum rates ranges from $1.343 to $1.784. A showing must be made that these rates do not themselves imperil the desegregation process and that the differential of some thirty percent between districts comports with an equitable decree

---

26. Doc. 730, Senate Bill 456, section 6:
   "Nothing in this Act or in this Chapter shall be construed to confer any power or authority to assign or reassign pupils between any districts."

27. Doc. 746, at 12–14.

28. An Assistant State Superintendent of Public Instruction believes this power is lodged in the State Board. Doc. 740, at 7. The cited statuto-

ry authority is dubious at best. *See* 14 *Del.C.* § 122(b)(3). However, the State Board has taken the position that it would seek but could not compel cooperation and has noted disputes of this kind would have to be resolved by the Court as they arose. Doc. 752, at 22.

29. Doc. 699, at 13 (Jan. 9, 1978 Order).

and will not frustrate or impede the desegregation process. Finally, with respect to the allocation of costs, plaintiffs contend that the Four District Plan's provision using federal money instead of state aid violates federal regulations.

The foregoing are set out as illustrative of the many items relevant to the Four District Plan which would be explored at a new round of hearings. The problem lies not primarily in the length of the requisite hearings and the necessary time consumed thereafter in formulating a reasoned decision, but in assuring that upon completion of the judicial proceedings adequate time remains to proceed in responsible fashion.

In the face of these significant and unanswered questions regarding the Four District Plan, the obvious conclusion at the present time is that absent an injunction the movant will continue to be irreparably injured. This injury is displayed more graphically by comparison of the hardships suffered by the respective parties by a grant or denial of an injunction. If an injunction is granted, the harm suffered is that a legislative will that there be four districts instead of one, expressed in dilatory fashion by a Legislature that has many times voiced its desire to stymie the overall desegregation effort, is frustrated. In contrast, if no injunction is issued, the NCCPBE is dissolved and the hastily formed Four District Plan which has as yet not been shown to be feasible, equitable, and legally sound represents the only blueprint for education in the desegregation area. Under these circumstances, the Court perceives that nothing but chaos and confusion will result. If, for example, a 9–3 pupil assignment concept could not be implemented in one or more of the four districts, or could not be implemented by September 1978, or could not be enforced or coordinated, or if 9–3 would not be the

appropriate pupil assignment remedy for each of the four districts, the NCCPBE, plaintiffs, and the entire community would be severely harmed.

The state of turmoil visited upon the NCCPBE already has caused immeasurable harm to the NCCPBE, plaintiffs, and the community. Charged with the responsibility to implement desegregation, the NCCPBE has taken numerous steps in that direction. Among them have been the hiring of staff and the identification of the staff and teachers' bargaining agent. Threats that the NCCPBE will be dissolved on April 15 obviously imperil efforts both to recruit talent and negotiate a contract with public school employees.[30] The impending dissolution of the NCCPBE obviously impairs its ability to make decisions on which people can rely. The end result may well be that anger and bitterness arising out of this state of confusion will be directed toward and imperil the desegregation process.

In addition, the Four District Plan recruits members of the NCCPBE to sit on each of the four interim boards and utilizes other persons who are engaged in planning for one district. With their attention divided and their loyalties split, these civic minded individuals undertaking an unpopular task are now caused to live a schizophrenic existence. The end result is obstruction of the desegregation effort and hardship to the movant and the community.

The introduction of successive and varying tax rates represents a further impediment. Property owners already facing a tax increase as a result of consolidation need to know with some specificity and finality what the tax rate will be. This information should be given well in advance of the tax due date.[31]

In addition to muddling the tax situation, the Four District Plan has led to other

**30.** Doc. 741, at 4–6.

**31.** The Court notes with appreciation that Wilmington Savings Fund Society, a major mortgage lender in the desegregation area, has already undertaken to advise its mortgagors of the amount of increased taxes due September 30, 1978 for the fiscal year commencing July 1, 1978.

instances of confusion. For example, when a top administrator in the single district sought curriculum information from the State's Department of Public Instruction, he was informed "that until the Four District Plan provisions have been accepted or rejected this would be premature on my part." [32] Irrespective of whether this incident is intrinsically significant, it typifies the bureaucratic snafus that will inevitably occur on a routine basis unless order is the rule of the day. The movant clearly makes a sufficient showing of comparative hardship to justify a preliminary injunction.

With this recitation of facts and unanswered questions in mind, application of the fourth criterion for issuance of a preliminary injunction—the public interest—assumes proper focus. The Court perceives the public interest in this circumstance as the assurance of safe, orderly, and effective education in a desegregated public school system. The NCCPBE has given more than adequate preliminary promise that it will fulfill this objective. It suffices to say that the Four District Plan, with no guarantee that 9-3 can be met, a tax scheme open to serious question, governing boards that have had no opportunity to demonstrate their ability, and a host of unsolved questions, does not. Given that the educations of over 64,000 children hang in the balance, the public interest clearly requires enjoining the Four District Plan. The Court will therefore order that defendant State Board be enjoined from implementation of Senate Bill 456 and Plan for the Reorganization and Desegregation of Designated School Districts in New Castle County, Delaware.[33]

II. Motion of the State Board of Education

The State Board desires the Court to modify its January Orders to embody the Four District Plan. Because the State Board's motion was not made until after an appeal of those orders was taken to the Third Circuit, precedential and jurisdictional problems are created.

First, the Court is not at all confident that the legislative action taken at this late date may properly come before it. The Third Circuit expressly invited the Legislature to act on both pupil assignment and governance within sixty days of its Opinion issued May 18, 1977. Because the Legislature failed to act within that period of time and now belatedly has provided only a governance scheme, quite possibly the law of the case precludes review of that legislation.

In addition, the State Board's motion creates substantial jurisdictional questions. It is fundamental that upon appeal of a final order, jurisdiction vests in the appellate court. *Plant Economy Inc. v. Mirror Insulation Co.*, 308 F.2d 275, 276–77 n.7 (3d Cir. 1962). The trial court can take no action, save that necessary to protect its decree, without permission from the appellate court. 9 *Moore's Federal Practice* ¶ 203.11, at 736. The rationale for this rule is the obvious conflict created by the litigant who seeks to have the court of appeals review the order of the lower court while at the same time he implores the lower court to revise its ruling. In order that the parties be guided by principles of order and finality and that the judicial right hand will know what the left hand is doing, carefully drawn rules govern post judgment motions.

F.R.Civ.P. 59 provides that if a motion is brought on within ten days of entry of final judgment, a new trial may be granted or a trial court may amend its findings of fact

---

32. Doc. 744 App.

33. This is not to say that the Legislature or defendant State Board is forever precluded from altering its manner of desegregation, but only that its actions must be taken in further-ance of and not in opposition to desegregation. Action likely to upset current efforts to desegregate without providing a constitutional and equitable substitute capable of implementation without disruption will not be permitted.

and conclusions of law. Because in the instant case more than ten days have passed, Rule 59 is clearly inapplicable.[34] F.R.Civ.P. 60(b) provides *inter alia* that upon the discovery of new evidence which could not have been uncovered in time to move for a new trial under Rule 59, a motion for reconsideration may be brought on within a reasonable time. Although defendant State Board has not invoked any rule, reliance on Rule 60 is assumed. However, under Rule 60(b), "the district court lacks power to grant relief from the judgment . . . except with permission of the appellate court." 7 *Moore's Federal Practice* ¶ 60.30[1], at 418.

Acknowledging that this Court is without jurisdiction to hear the merits of the State Board's motion and that the proper procedure is application to the Third Circuit for a limited remand, the State Board has declined so to proceed because it understandably does not wish to jeopardize the early date set for appellate argument as would likely occur if the Third Circuit remanded the case. On the other hand, the State Board wishes to avail itself of the opportunity afforded by a remand. Consequently, the State Board proposes that this Court embark on an evidentiary hearing to informally consider whether the merits of the Four District Plan "would have any likelihood of success when properly before the Court." [35]

Should that informal determination be unfavorable, the appeal process will not have been interrupted. If that determination is favorable to defendant, "the State would very definitely have the hard question of election—it would have to fish or cut bait." [36] Therefore, the State Board does not guarantee that even upon a favorable resolution it would seek a remand.

In support of this wait and see approach to what would only be an advisory opinion, defendant State Board relies on *Hattersley*

*v. Bollt*, 512 F.2d 209, 215–16 (3d Cir. 1975), and *Franki Foundation Co. v. Alger-Rau & Associates, Inc.*, 513 F.2d 581, 587 (3d Cir. 1975). In both opinions, Judge VanDusen discussed post-trial motions brought under Rule 59. He determined in the first case that, pending appeal, before a district court may pass upon a timely motion under F.R. Civ.P. 59, the Court of Appeals must be petitioned to remand and, in the second case that pursuit of post-trial motions at the district court level is not a requisite to an appeal. A third case cited by defendant is *Stradley v. Cortez*, 518 F.2d 488 (3d Cir. 1975). Although it at least discusses Rule 60, it is not any more supportive of defendant's position than are the first two cases in that the circuit court merely determined that a motion for a new trial brought some four years after trial is time barred by both Rule 59 and Rule 60.

The holdings of these cases do not support defendant's position but rather instruct that the Court is without jurisdiction to act absent a remand from the appellate court. The Court concludes that defendant must be relying upon certain cautionary language in the *Hattersley* opinion, to the effect that defendant failed to secure a determination from the district court on the merits of his post-trial motion. However that language points defendant in the direction of the district court, the Court does not read it to support the proposition that the Court may engage in a full review of the Four District Plan in advance of a remand for that purpose. More likely the *Hattersley* court was reacting favorably to a procedure adopted in other circuits permitting a district court to indicate whether it would be likely to permit a new trial on the basis of new evidence. But such a procedure does not contemplate indicating any position on the merits of that evidence.

The procedure, first articulated in *Smith v. Pollin*, 90 U.S.App.D.C. 178, 179, 194 F.2d 349, 350 (1952), provides that a movant under Rule 60(b), if his appeal is still pending,

---

**34.** F.R.Civ.P. 52(b) which provides that a court. may amend its judgment and findings also has an applicable time period of ten days after entry of judgment.

**35.** Doc. 755, at 22.

**36.** *Id.* 25.

may file a motion with the district court for a new trial and, if the trial court indicates it will grant the motion, the appellant should then make a motion in the appellate court for a remand of the case in order that the district court may grant the motion for a new trial. Such a procedure avoids the futility of a trip to the appellate court for a remand to the district court to consider a Rule 60(b) motion if the latter is not disposed to grant a new trial in the first instance. *Ryan v. United States Lines Co.,* 303 F.2d 430, 434 (2d Cir. 1962).

However, the initial determination permitted by the district court is much narrower than that sought by defendant State Board which would have the Court embark at this point on a foray into the practical, equitable and constitutional merits of the Four District Plan. The procedure set out in *Smith, supra,* and adopted by subsequent courts, simply permits the district court, upon reconsideration, to indicate if it is inclined to vacate its judgment in order to permit a new trial. *Carr v. District of Columbia,* 177 U.S.App.D.C. 432, 543 F.2d 917 (1976); *Ag Pro, Inc. v. Sakraida,* 481 F.2d 668 (5th Cir. 1973); *Weiss v. Hunna,* 312 F.2d 711 (2d Cir. 1963); *Ryan, supra; Herring v. Kennedy-Herring Hardware Co.,* 261 F.2d 202 (6th Cir. 1958); *Smith, supra.*

As one court described the procedures, "[t]he most the District Court could do was to either indicate that it would 'entertain' such a motion or indicate that it would grant such a motion. If appellant had received such an indication, its next step would have been to apply to this Court for a remand." *Crateo, Inc. v. Intermark, Inc.,* 536 F.2d 862, 869 (9th Cir. 1976). Clearly what the State Board seeks is far more than is provided by this procedure. Therefore, unless or until there is a remand from the Third Circuit, any inquiry by the Court into the merits of the Four District Plan is highly inappropriate.

Finally, to the extent the State Board motion can be construed as a motion to vacate judgment in order to grant a new trial, the motion will be denied. It is unclear that a new trial is what the State Board seeks and it is far from settled whether by the language in the *Hattersley* opinion the Third Circuit has adopted the premise that upon appeal the district court retains jurisdiction to consider and deny motions brought pursuant to Rule 60(b). These questions aside, the foregoing questions of practicality and timeliness compel rejection of a request for a new trial.