**Brenda EVANS et al., Plaintiffs,**

v.

**Madeline BUCHANAN et al., Defendants.**

**Civ. A. Nos. 1816–1822.**

United States District Court, D. Delaware.

June 13, 1978.

---

Joseph A. Rosenthal, and Irving Morris, of Morris & Rosenthal, Wilmington, Del., and Louis L. Redding, Wilmington, Del., for individual plaintiffs.

Richard Allen Paul, of Paul, Lukoff & Hurley, Wilmington, Del. (Louis R. Lucas, Ratner, Sugarmon, Lucas, Salky & Henderson, Memphis, Tenn., of counsel), Paul R. Dimond, of O'Brien, Moran & Dimond, Ann Arbor, Mich., William L. Taylor, Center for National Policy Review, Washington, D. C., for intervening plaintiffs.

Aida Waserstein, Wilmington, Del., for intervening Hispanic plaintiffs.

Richard R. Wier, Jr., Atty. Gen., State of Del., and Regina M. Small, Asst. Atty. Gen., State of Del., William Prickett, and Mason E. Turner, of Prickett, Ward, Burt & Sanders, Wilmington, Del., Philip B. Kurland, Chicago, Ill., for defendant State Board of Education.

Edward W. Cooch, Jr., of Cooch & Taylor, Wilmington, Del., for Marshallton-McKean School District.

Samuel R. Russell, of Biggs & Battaglia, Wilmington, Del., for Alexis I. duPont School District.

William Poole, of Potter, Anderson & Corroon, Wilmington, Del., for Alfred I. duPont School District.

James T. McKinstry, of Richards, Layton & Finger, Wilmington, Del., for Claymont and Stanton School Districts.

John P. Sinclair, of Potter, Anderson & Corroon, Wilmington, Del., for Newark School District.

Jerome O. Herlihy, of Herlihy & Herlihy, Wilmington, Del., for Conrad Area School District.

Howard M. Handelman, and Jeffrey M. Weiner, of Bayard, Brill & Handelman, Wilmington, Del., for New Castle County Vocational-Technical School District.

James M. Tunnell, Jr., and Richard D. Allen, of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for Mount Pleasant School District.

David F. Anderson, of Potter, Anderson & Corroon, Wilmington, Del., for New Castle-Gunning Bedford School District.

Thomas S. Lodge, of Connolly, Bove & Lodge, Wilmington, Del., for DeLaWarr School District.

Henry N. Herndon, Jr., and Edward M. McNally, of Morris, James, Hitchens & Williams, Wilmington, Del., for New Castle County Planning Board of Education, a non-aligned party.

Leonard L. Williams, and George E. Evans, Wilmington, Del., for Wendell Howell, member of New Castle County Planning Board of Education.

Sheldon N. Sandler, of Bader, Dorsey & Kreshtool, Wilmington, Del., amicus curiae, Delaware State Education Association.

Clifford B. Hearn, Jr., of Balick & Hearn, P.A., Wilmington, Del., amicus curiae, Wilmington Federation of Teachers AFT AFL–CIO.

## OPINION

MURRAY M. SCHWARTZ, District Judge.

Presently before the Court are defendants' State Board of Education ("State Board") and suburban predominantly white school districts motions for a stay of this Court's January 9, 1978 secondary remedial decree [1] in this lengthy desegregation litigation.[2] The decree to which the stay motion is directed addressed the remedial issues of pupil assignment, governance of the reorganized district, ancillary relief and retention of jurisdiction. Following issuance of the January decree the parties engaged in expedited briefing and received an original en banc [3] hearing before the Third Circuit Court of Appeals on May 10, 1978. On May 31, 1978 the instant motions were filed, requesting a stay of the secondary remedial decree pending completion of appellate review. Thereafter, responsive papers were served on June 7 and oral argument held on June 12.

---

1. On January 20, 1978, upon motion of the New Castle County Planning Board of Education ("NCCPBE") for modification and clarification, an additional order was entered. The January 9, 1978 and January 20, 1978 orders collectively are referenced as the secondary remedial decree. The primary remedial decree is the 1976 three-judge court decision. 416 F.Supp. 328 (D.Del.1976).

2. The complaint was filed in federal court in 1956 after a Delaware state court action was reviewed by the Supreme Court as one of the consolidated actions in the landmark *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (*Brown I*). The current phase which commenced in 1971 has generated several published opinions and rulings. *Evans v. Buchanan*, 455 F.Supp. 692 (D.Del.1978) (tax opinion denying State Board motion for permanent injunction); *Evans v. Buchanan*, 447 F.Supp. 1041 (D.Del.1978) (opinion preliminarily enjoining implementation of a four dis-

trict reorganization); *Evans v. Buchanan*, 447 F.Supp. 982 (D.Del.1978) (secondary remedial decree opinion); *Evans v. Buchanan*, 416 F.Supp. 328 (D.Del.1976) (three-judge court opinion on primary remedial decree), *aff'd with modification*, 555 F.2d 373 (3d Cir.) *cert. denied*, 434 U.S. 880, 98 S.Ct. 235, 54 L.Ed.2d 160 (1977); *Evans v. Buchanan*, 435 F.Supp. 832 (D.Del.1977) (opinion granting a partial stay pending a determination of the petition for writ of certiorari and rejecting defendant State Board's reverse volunteerism plan to achieve desegregation); *Evans v. Buchanan*, 424 F.Supp. 875 (D.Del.1976) (opinion rejecting application for a stay as premature); *Evans v. Buchanan*, 379 F.Supp. 1218 (D.Del.1974), and *Evans v. Buchanan*, 393 F.Supp. 428 (D.Del. 1975), *sum. aff'd*, *Buchanan v. Evans*, 423 U.S. 963, 96 S.Ct. 381, 46 L.Ed.2d 293 (1975).

3. Chief Judge Seitz and Judge Gibbons did not participate.

■ Previous requests in this litigation[4] for stays of remedial orders pending appeals have engendered the standard that "a stay may be appropriate in a case where the threat of irreparable injury to the applicant is immediate and substantial, the appeal raises serious and difficult questions of law in an area where the law is somewhat unclear and the interests of the other parties and the public are not harmed substantially."[5] In addition, where the right vindicated by a judicial decision is of paramount constitutional significance, the showing which must be made for grant of a stay is necessarily increased. Thus in several school desegregation cases stays have been denied for want of a showing of exceptional or extraordinary circumstances.[6]

■ The applicant for a stay carries the burden of satisfying the standard. *Reserve Mining Co. v. United States*, 498 F.2d 1073, 1076–77 (8th Cir.), *application to vacate stay denied*, 419 U.S. 802, 95 S.Ct. 287, 42 L.Ed.2d 33 (1974). In assessing whether the movant has met its burden, no one factor can be isolated, but rather all criteria must be weighed. In so doing, "a court should not and perhaps cannot erect an artificial absolute standard; there are degrees of irreparable injury and probability of a successful appeal. The duty of this Court is to weigh the strength of these showings against each other and balance them against the potential harm to the interests of the plaintiffs and the public."[7] In the procedural context of the instant matter, the interest of the movants must be balanced against the interests of plaintiffs, the New Castle County Planning Board of Education ("NCCPBE") and the public.

## Irreparable Injury to the Movants

For present purposes, the criterion of irreparable injury involves assessing the effect upon defendants of permitting implementation of the January 9, 1978 decree pending final appellate review of that order. Defendants assert that if that secondary remedial decree is not stayed, the eleven component school districts comprising the desegregation area will go out of existence. They argue that should the January 9 order be reversed, an adverse effect would be visited upon the education of over 60,000 children if reorganization must be undone. Defendants then charge that the consequences of a change in governance to a single district include a redistribution of the tax burden and an inability to elect any school board member until 1980. Defendants further aver that if the reorganization is not stayed, a significant increase will occur in state and local educational costs and imposition of educational programs without local democratic control over financial cost or content of those programs. Finally, defendants state that if the January 9 Order is not stayed pending final appellate review, duly elected or appointed officials will have lost control over the tax setting process.

Most of the movant's alleged irreparable injury flows as a consequence of the reorganization scheme which replaces eleven districts with one entity. But did the January

4. *Evans v. Buchanan*, 435 F.Supp. 832 (D.Del. 1977); *Evans v. Buchanan*, 424 F.Supp. 875 (D.Del.1976); Doc. 506.

5. *Evans v. Buchanan, supra*, 435 F.Supp. at 844.

6. *See, e. g., Drummond v. Acree*, 409 U.S. 1228, 93 S.Ct. 18, 34 L.Ed.2d 33 (1972) (Powell, J., denying stay); *Edgar v. United States*, 404 U.S. 1206, 92 S.Ct. 8, 30 L.Ed.2d 10 (1971) (Black, J., denying stay); *Carter v. West Feliciana Parish School Bd.*, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477 (1970) (per curiam) (reversing time extension for desegregation); *Keyes v. School District No. 1*, 396 U.S. 1215, 90 S.Ct. 12, 24 L.Ed.2d 37 (1969) (Opinion in chambers) (Bren-nan, J., vacating stay); *Alexander v. Holmes County Bd. of Educ.*, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969) (per curiam) (vacating circuit court order granting additional time to desegregate).

The previous grant of a stay in this case was predicated upon exceptional circumstances detailed in an Opinion. 435 F.Supp. 832, 841–49 (D.Del.1977). Those circumstances are no longer present in light of the opportunities for appellate review accorded defendants and the significant steps taken to prepare for desegregation commencing in September 1978. *See* text *infra*.

7. *Id.* at 842.

secondary remedial decree eliminate the eleven component districts? A brief review of the pertinent factual and procedural history of this litigation indicates it did not.

Elimination of all the individual districts first surfaced in the three-judge court's May 1976 remedy opinion as a possible result in the event state authorities failed to act in timely fashion. *Evans v. Buchanan,* 416 F.Supp. 328 (D.Del.1976). On appeal the Third Circuit Court of Appeals on May 18, 1977 affirmed the governance scheme of the three-judge court including elimination of the eleven component districts but deferred to state authorities for an additional sixty days in which they could formulate and present a reorganization proposal. Despite the Third Circuit's invitation, the Legislature chose not to act with respect to reorganization. Instead defendant State Board presented a desegregation scheme dubbed "reverse volunteerism" which on August 5, 1977 was rejected on procedural, equitable and substantive grounds. *Evans v. Buchanan,* 435 F.Supp. 832 (D.Del.1977).

Also on August 5, pursuant to application of defendants, the Court partially stayed the operation of the three-judge court's primary remedial decree, the Third Circuit mandate and the order of this Court issued pursuant to that mandate.[8] Specifically, this Court stayed implementation of the one district plan, transfer of authority to the NCCPBE and abolition of the eleven districts "pending disposition by the United States Supreme Court of the petition of the defendant State Board of Education for a writ of certiorari docketed July 25, 1977 and for such further time thereafter as this Court deems necessary." [9] Following denial of certiorari by the Supreme Court,[10] the Court on November 8, 1977:

"ORDERED that full implementation including pupil and staff assignment within a single district be accomplished by September 1978 and that all intervening steps necessary to achieve that goal proceed forthwith. To the extent consistent with this Order, plaintiffs' motion to vacate the stay entered on August 5, 1977 is granted."

After hearings the Court issued its secondary remedial decree on January 9, 1978. Thereafter, the Delaware General Assembly passed a four district reorganization plan. Implementation of the four district plan was preliminarily enjoined with no appeal taken.[11] Subsequently, defendant State Board determined to implement a bill [12] enacted on the same day as the four district reorganization bill. The latter bill had established a limit on the tax rate for local current operating expenses of the single district lower than the tax rate established by the NCCPBE on February 23, 1978. For reasons detailed elsewhere, it was concluded the legislative enactment as implemented by defendant State Board resulted in a taxation scheme likely to frustrate or imperil the desegregation process in the desegregation area. As a consequence, the Court denied defendant State Board's motion for a permanent injunction which it sought against the NCCPBE.[13] The denial of that permanent injunction has been appealed. In addition, on June 2, 1978 defendant State Board filed an application for a partial stay from the denial of the permanent injunction.[14]

The above factual and procedural recital highlights that neither the upcoming demise of the eleven districts nor the creation of the single district was caused by the

---

**8.** Pursuant to that mandate, this Court on May 19, 1977 issued its order as expressly directed by the Third Circuit. *Evans v. Buchanan,* 555 F.2d 373, 380–81 (3d Cir. 1977).

**9.** Doc. 567, ⸢ 2; *Evans v. Buchanan, supra,* 435 F.Supp. at 849.

**10.** 434 U.S. 880, 98 S.Ct. 235, 54 L.Ed.2d 160 (1977).

**11.** *Evans v. Buchanan,* 447 F.Supp. 1041 (D.Del.1978).

**12.** Senate Bill ("S.B.") 457.

**13.** *Evans v. Buchanan,* 455 F.Supp. 692 (D.Del. 1978).

**14.** The application for a partial stay of the order concerning the taxation question was also heard on June 12, 1978.

January 9 secondary remedial decree. Rather, the three-judge court's 1976 primary remedial decree, the May 18, 1977 Third Circuit mandate affirming the three-judge court, and the May 19, 1977 order of this Court issued pursuant to that mandate are the operative orders which in the absence of legislative action brought the single district into existence in place of the eleven component districts. The irreparable harm which defendants now maintain flows from the January 9, 1978 order was that urged by defendants and accepted by the Court on August 5, 1977 as the basis upon which to enter a partial stay pending disposition of an application for certiorari by the Supreme Court. Under this circumstance, it is difficult, if not impossible, to ascribe to the January 9, 1978 secondary remedial decree the irreparable injury which defendants assert they will incur. Stated succinctly, assuming arguendo defendants are about to suffer some irreparable injury, a stay of the January 9 order would not prevent the great majority of that alleged injury because it neither created the single district nor abolished the eleven component districts.[15] Further, assuming the injury defendants now seek to stay derives from orders prior to January 9, clearly no opportunity for relief presently exists because finality has attached to those rulings.

To the extent defendants alleged irreparable injury is attributable to the secondary remedial decree, the weight to be assigned that injury in measuring it against the remaining criteria for issuance of a stay is far less than that accorded it on August 5, 1977 when a partial stay, subsequently vacated, was entered. Movants' alleged injury in

support of a stay is diminished by changed circumstances over the course of almost an entire year.

On August 5, 1977 the Court stated: "The most cataclysmic change that will occur if a stay is not granted is the abolition of the eleven affected school districts as distinct political and administrative entities. The consequences of this major reorganization are similarly very serious."[16] At that time tax bills had already been sent to taxpayers on the basis of different rates in each of the eleven districts, and a pupil assignment plan had not been developed. Moreover, the NCCPBE charged with planning for a single district needed "to develop and implement a new administrative structure for the public schools in the eleven existing districts."[17] Problems in staffing were also anticipated due to different bargaining representatives and varying wage scales for the same work. In sum, the Court noted "[l]asting harm would be done to the education of these children if they must endure the turmoil and uncertainty involved in reorganizing into one district and then must undergo the rigors of disestablishing the district if the defendants' petition to the Supreme Court were successful. There very likely also would be substantial disruption of teaching assignments, and potential curriculum hiatus for students because not all districts have identical course offerings."[18]

As on August 5, 1977, the change from eleven districts to one still fairly can be characterized as "cataclysmic." But although the characterization remains the same, its import is lessened. First, the Delaware Legislature has belatedly placed its imprimatur upon a four district reorganiza-

**15.** The above conclusion is inescapable when one considers the introductory language to the "Governance" portion of the January 9, 1978 order:

"*In conformity with the prior orders of this Court and the May 18, 1977 mandate of the Third Circuit Court of Appeals,* there shall be a single school district (the "New District") comprised of the present Alfred I. duPont, Alexis I. duPont, Claymont, Conrad, DeLaWarr, Marshallton-McKean, Mount Pleasant, New Castle-Gunning Bedford, Newark, Stan-

ton and Wilmington school districts (the "Component Districts"), which shall be governed by the Board having the powers and duties provided for by this Order and the prior orders of this Court, . . ." Doc. 699, at 1–2 (emphasis added).

**16.** *Evans v. Buchanan, supra,* 435 F.Supp. at 842.

**17.** *Id.*

**18.** *Id.* at 843 (footnote omitted).

tion with consequences far more severe than if the one district plan went into effect.[19] Next, unlike the situation on August 5, 1977, tax bills have not yet been sent to county residents who are scheduled to receive tax bills with a single local school tax rate. Also, a new administrative structure for the single district has been developed and is functioning. Similarly, a single bargaining representative has been elected and salary negotiations are underway. In like vein, in contrast to circumstances of August 5, 1977, a teacher assignment plan with direct notice to over four thousand teachers and a pupil assignment plan including individual notification to over 60,-000 students and their parents have been implemented. For the most part, the teacher assignment plan calls for the teachers to follow the students and provides for a uniform core curriculum. Thus, the potential for disruption of teaching assignments and gaps in curriculum has been minimized. Finally, in the event there should be a reversal, the now reduced turmoil and uncertainty to the children resulting from undoing a reorganization can be eliminated by keeping the teacher and pupil assignment plans in effect until the end of the school year. *Cf. Dayton Board of Education v. Brinkman,* 433 U.S. 406, 421, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977).

The remaining elements of irreparable injury which can be attributed to the January 9, 1978 secondary remedial decree are that school board elections would not commence until 1980, state and local educational costs would increase and the duty of establishing a tax rate would be removed from the eleven duly elected and appointed school boards. The impact of injury resulting from appointment of school board members until 1980 is blunted when one recognizes that the individual membership of the NCCPBE are all members of school boards of the component districts appointed to the NCCPBE by defendant State Board of Education. Increased educational costs result

primarily from the ancillary relief provisions of the January 9 Order and although State defendants contest payment of these costs, the need for this relief has not been disputed.

Finally, defendants' position with respect to injury resulting from a maximum local tax rate set by allegedly nondemocratic means is undermined when it is recognized the January 9, 1978 opinion accompanying the secondary remedial decree expressly conferred upon the Delaware Legislature the opportunity to provide imput regarding the tax rate by altering the tax parameters in a manner not imperiling the desegregation scheme [20] and that body passed legislation pursuant to the Court's invitation. Defendants' concern with respect to taxation primarily relates not to the January 9 Order but rather to the Order of this Court dated May 5 denying an application for a permanent injunction. This latter decision is now also on appeal and a separate stay application pertaining to the May 5 ruling was filed in this Court on June 2, 1978. In sum, reference to the establishment of a local tax rate cap in the secondary remedial decree fails to demonstrate irreparable injury.

It is concluded that when viewed either singly or as a whole, defendants' demonstration of irreparable injury is relatively weak.

### Showing as to Serious and Difficult Questions of Law

Lack of a strong showing of irreparable injury is not necessarily determinative in denying a stay if an overwhelmingly strong showing is made that the appeal raises serious and difficult questions of law in an area where the law is unclear and that absent a stay the interests of other parties and the public would be harmed substantially.

Defendants make two separate contentions concerning the complexity of legal problems emanating from their appeal from

---

19. A detailed discussion of the four district plan and its untimely enactment may be found in *Evans v. Buchanan,* 447 F.Supp. 1041 (D.Del. 1978).

20. *Evans v. Buchanan,* 447 F.Supp. 982, 1026 (D.Del.1978).

the January 9 Order: (1) all the serious and difficult questions of law that existed at the time of this Court's grant of a partial stay on August 5, 1977 persist; and (2) additional questions of similar difficulty have been generated by the secondary remedial decree.

The first contention completely ignores the present procedural posture of the application for stay, viz., the Third Circuit Court of Appeals affirmed the primary remedial decree [21] and the Supreme Court denied certiorari.[22] Under this circumstance the Third Circuit mandate "would appear to be binding on this court under the law of the case principle, which has been explained by the Supreme Court as follows:

> 'When matters are decided by an appellate court, its rulings, unless reversed by it or a superior court, bind the lower court. Thus a cause proceeds to final determination. While power rests in a federal court that passes an order or decision to change its position on a subsequent review in the same cause, orderly judicial action, except in unusual circumstances, requires it to refuse to permit the relitigation of matters or issues previously determined on a former review.'

*Insurance Group Committee v. Denver & Rio Grande Western R.R.*, 329 U.S. 607, 612, 67 S.Ct. 583, 585, 91 L.Ed. 547 (1947) (footnote omitted)." *Evans v. Buchanan*, 555 F.2d 373, 377 (1977). *See also id.* at 388–89 (Garth, J., dissenting).

Concerning the second contention, with the denial of certiorari there can be absolutely no justification or rationalization for this district court to regard the Third Circuit mandate as anything but the law of the

case.[23] In short, defendants have failed to distinguish a request for a stay pending determination of a certiorari petition where application followed arguably relevant Supreme Court pronouncements issued subsequent to the decision sought to be reviewed from a stay application directed to a different order pending disposition of an appeal by a circuit court. Defendants have not pinpointed any serious or difficult question of law arising from the January 9 Order which is not inextricably linked to their "but for" argument set to rest by the law of the case doctrine.[24] Therefore defendants have made no showing of serious and difficult questions in an area where the law is unclear.

Having found only a weak demonstration of irreparable injury and no serious and difficult questions of law, the Court now turns to whether plaintiffs, other interested parties, and the public would be injured if a stay were not granted.

### *Harm to the Plaintiffs and Other Interested Parties*

#### A. *Harm to the Plaintiffs*

The starkly simple yet obviously vital injury plaintiffs would incur if a stay is granted is an additional year of delay in vindication of their constitutional rights.[25] Defendants urge as they did prior to issuance of the August 5, 1977 stay order that this injury is somewhat muted by passage of legislation extending for an additional school year a liberalized version of the voluntary transfer program which otherwise was destined to end on June 30,

---

**21.** 555 F.2d 373 (3d Cir. 1977).

**22.** 434 U.S. 880, 98 S.Ct. 235, 54 L.Ed.2d 160 (1977).

**23.** It is cautioned that the Court reads nothing into the merits by reason of the denial of certiorari, but simply applies an obvious rule of finality so as to virtually command application of the law of the case doctrine which in turn precludes consideration of legal issues sought to be resurrected for purposes of a stay application.

**24.** For further explication of the "but for" issue and the rule of the law of the case, see *Evans v. Buchanan, supra,* 447 F.Supp. at 1009–11.

**25.** It is assumed defendants would urge their previous position that implementation of the pupil assignment component of the desegregation process should not commence during the school year. *See* Doc. 638.

1978.[26] In the context of this case, extension for one year of the voluntary transfer legislation in no way redresses the constitutional wrongs visited upon plaintiffs. In this lengthy litigation where plaintiffs have prevailed every step of the way, an additional year of delay of full vindication of constitutional rights is highly significant. The ineluctable conclusion is that plaintiffs will suffer substantial irreparable harm if a stay were to be granted.

### B. Harm to the New Castle County Planning Board of Education

For reasons not clear of record, the NCCPBE[27] has taken no position with respect to the application for stay. Accordingly, it must be concluded on this record that no harm would befall the NCCPBE if a stay were granted.[28]

### Public Interest

In this case, the key components of the public interest have been identified as: (1) the right of every school child, white or black, to attend a unitary school system operated in such manner as to be untainted by the vestigial effects of *de jure* segregation; (2) the interest of the public in certainty defined as "a final disposition by the Supreme Court either to deny or grant [the pending application for] the writ of certiorari," and (3) the interest of the public in a stable educational system.[29] The parties have brought no other consideration to the attention of the Court.

If a stay were granted, the interest of all children in attending a unitary school system would be frustrated for an additional year. Moreover, a stay would unnecessarily interject confusion and undermine the finality attained with respect to the primary remedial decree resulting from the Supreme Court's denial of certiorari of the May 18, 1977 Third Circuit mandate.

There remains the very important interest of the public in a stable educational system. This Court previously noted:

"The interests of a child, black or white, are not served, however, by subjecting his educational experience to the uncertainties of the judicial process. There can be little doubt of the significant disruption, both personally and educationally, that would occur if the one-district plan were reversed after implementation had begun. It is a cost incapable of accurate measurement, but it must be considered, however crudely, in this Court's balancing process."[30]

At this point, however, because planning and implementation are far advanced, disruption will also occur if a stay is granted.

Other than litigation postures, all parties have been proceeding on the premise that

---

**26.** S.B. 527. The operative sections of S.B. 527, signed into law on May 5, 1978 only five days before oral argument in the Third Circuit Court of Appeals, provide that steps be taken to effectuate voluntary transfers,

"[a]fter any decision or order of the United States Court of Appeals for the Third Circuit or the United States District Court for the District of Delaware permitting the eleven (11) public school districts directly affected by the case of *Evans v. Buchanan* to continue to exist, . . ."

From this language it is inferred that if the district and circuit courts deny a stay but the same were granted by a United States Supreme Court Justice, S.B. 527 would be inapplicable with all voluntary transfer students compelled to return to their home districts. Further, it is noted many of the provisions of S.B. 527 directed toward productive dissemination of voluntary transfer information are incapable of implementation because the children will no longer be in school.

**27.** The NCCPBE is a five member board appointed by defendant State Board of Education and consisting of four individual members from the school boards of the still extant component predominantly white districts and one member from the Wilmington district.

**28.** Because both the purpose and the planning function of the NCCPBE would be jeopardized by grant of a stay, the noncommittal position assumed by it is curious, to say the least. At oral argument counsel for the NCCPBE indicated that the NCCPBE is deeply concerned with regard to the issues to be determined. Nonetheless, the Court is bound by the record.

**29.** *Evans v. Buchanan, supra*, 435 F.Supp. at 847–48.

**30.** *Evans v. Buchanan, supra*, 435 F.Supp. at 847.

714

the January 9 secondary remedial decree will be operative in September 1978. As a consequence, the NCCPBE is functional. All administrators are former or present employees of the component districts, devoting either full or half time to the single district so that on July 1, 1978 it will be in a position to assume its responsibility. In carrying out its goal, the NCCPBE has mailed individual pupil assignment notices to each parent of the over 60,000 children in the public school system, assigned all teachers by school and grade, designated fourteen schools for closing, revamped and achieved a common core curriculum, directed and accomplished a uniform reduction in the number of teachers, conducted orientation programs, ordered additional school buses, applied for federal funding, done preliminary budgeting, caused the election of an exclusive bargaining representative for the teachers and is currently engaged in difficult negotiations with the teachers' bargaining representative.[31]

In contrast, because all planning and operations have been going forward on the assumption the component districts would be eliminated on June 30, 1978, it is difficult to visualize how or why the component districts would have undertaken to prepare for the commencement of school in September 1978 or done anything but assist a smooth transition to a unitary district. Striking examples of functions not performed which normally would be well underway are budget formulation and negotiation by component districts with bargaining representatives for their respective teachers.

In this connection and as an illustration, one serious matter is the riffing (reduction in force) of teachers.[32] The component districts had no choice but to follow the policy of the NCCPBE which required that all teachers with one year of employment or less be given notice of termination because of declining enrollment.[33] Although this uniform policy well suits single district governance, it is less than desirable if the eleven districts are to remain in existence because the need for retention of teachers is not uniform throughout the eleven districts. Thus, the Newark district riffed teachers although its enrollment projection shows a stable student population. The more serious problem, however, is in those component districts that should have riffed teachers beyond one year's experience based on district enrollment projections, but did not on the understandably correct assumption that they would be out of existence. The net result is that if they remain extant some of the component districts will be obligated to pay teachers whose services are not required. Worse, to the extent the number of teachers on the payroll exceeds allowable "teacher units" calculated under State law, the district will be responsible for the State's share of the salary of those teachers.

In summary, the NCCPBE's significant planning and implementation efforts in contemplation of a single district governance scheme and the concomitantly reduced role of the eleven component districts which will cease to exist as of June 30, 1978, have radically altered the focus of public interest in a stable educational system. Unlike the situation on August 5, 1977, given the present facts, it is now a close question of whether grant of a stay would further the public interest by enhancing stability of public education in the desegregation area.

*Conclusion*

■ Defendants having failed to make a strong showing of irreparable injury if a stay of the January 9, 1978 secondary remedial decree is not granted, and having been unable to demonstrate the presence of serious and difficult questions of law, the propriety of granting a stay becomes highly questionable. When there is added that plaintiffs will suffer substantial injury if a

31. Because the record is presently in the possession of the Third Circuit, record annotations cannot be supplied.

32. Under 14 *Del.C.* § 1410, notice of termination must be given to teachers by May 1 of any year.

33. Doc. 781, App. B.

stay is granted and that the public interest does not militate strongly, if at all, in favor of a stay, only one conclusion is possible. Defendants' application to stay transfer of full authority to the NCCPBE must be denied.