**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| ZACHARY BRUCH and JOSHUA SB, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 2024-1183-BWD |
| | ) | |
| SWITCHBOARD TECHNOLOGY LABS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER RESOLVING MOTION TO STAY PENDING APPEAL

WHEREAS:

A.    On November 19, 2024, plaintiffs Zachary Bruch and Joshua Kaufman ("Plaintiffs")[1] initiated this action through the filing of a Verified Complaint Pursuant to 8 *Del. C.* § 220 to Compel Inspection of Books and Records (the "Complaint").  *See* Dkt. 1.  The Complaint seeks an order compelling defendant Switchboard Technology Labs, Inc. ("Switchboard") to produce certain books and records identified in a November 1, 2024 demand (the "Demand").

B.    Switchboard is a software development company that builds blockchain oracle software.  Mar. 25, 2025 Tr. Telephonic Rulings of Ct. [hereinafter BR] 5,

---

[1] On December 18, 2024, the Court entered a Stipulation and Order Regarding Substitution of Plaintiff Joshua Kaufman, substituting Kaufman for Joshua SB, LLC, the entity through which Kaufman holds Switchboard stock.  Dkt. 25.

Dkt. 92. Switchboard was founded by Plaintiffs and non-parties Christopher Hermida, Mitchell Gildenberg, and Jackson Jessup. *Id.*

C.     In 2022, Switchboard began a process to issue cryptocurrency "tokens," which are digital assets created on a blockchain that represent assets or rights in a blockchain ecosystem. *Id.* at 6. But Switchboard's founders disagreed on a plan to allocate the tokens to be issued. *Id.* at 10. After Plaintiffs rejected two of Hermida's allocation proposals as "arbitrary and lack[ing] a consistent methodology," Hermida, Gildenberg, and Jessup exercised their majority voting power to execute stockholder written consents appointing non-party Mark Mugglestone to Switchboard's board of directors, with the intention that Mugglestone temporarily serve as the company's Chief Executive Officer, and tasked him with preparing a proposal to allocate the tokens. *Id.* at 10, 12–13. As directed, Mugglestone prepared a proposal, which he and one other director then approved (the "Token Allocation"). *Id.* at 13–14. Plaintiffs contend that the final Token Allocation was designed to unfairly enrich Hermida, Gildenberg, and Jessup at the expense of other stockholders. *Id.* at 16.

D.     Through the Demand, Plaintiffs seek books and records to value their interests in Switchboard, investigate Mugglestone's disinterestedness and independence, and investigate possible wrongdoing in connection with (1) Switchboard's entry into an asset assignment agreement and a loan agreement in furtherance of the token issuance, and (2) the Token Allocation.

2

E.     On February 21, 2025, the Court held a one-day trial.  At trial, Switchboard argued that Plaintiffs lacked a proper purpose for making the Demand, including because Plaintiffs lacked a credible basis to investigate possible wrongdoing, and that Plaintiffs' stated purposes are not their true purposes for seeking books and records.

F.     On March 10, the Court issued a forty-page post-trial oral ruling (the "Bench Ruling").  The Bench Ruling concluded that:

a.     Plaintiffs stated facially proper purposes to value their Switchboard shares and to investigate Mugglestone's disinterestedness and independence.  BR at 20.

b.     Plaintiffs failed to establish a proper purpose to investigate possible wrongdoing in connection with Switchboard's entry into the asset assignment agreement and the loan agreement.  *Id.* at 22–24.

c.     Plaintiffs established a proper purpose to investigate wrongdoing in connection with the Token Allocation by presenting sufficient evidence suggesting a credible basis from which the Court could infer that wrongdoing may have occurred.  *Id.* at 27.  On this issue, the Bench Ruling explained:

> [P]laintiffs seek to investigate possible wrongdoing in connection with the token allocation.  Switchboard contends that [P]laintiffs have not established a credible basis for investigation because the token allocation was approved by independent directors.

3

At the time of the allocation, the board comprised Jessup, Mugglestone, and Madfes. Jessup received tokens and therefore did not vote on the allocation.

According to Switchboard, Mugglestone and Madfes were both independent with respect to the allocation because they did not receive tokens. The evidence at trial provides a credible basis to suspect that Hermida, Gildenberg, and Jessup, acting together by stockholder consent, exercised a majority of the company's voting power to appoint Mugglestone as a director and CEO, and tasked him with developing a token allocation proposal. Hermida, Gildenberg, and Jessup then participated in Mugglestone's process, which resulted in Mugglestone recommending an allocation that granted Hermida, Gildenberg, and Jessup valuable corporate assets in the form of tokens. And as Mugglestone undertook that process, the same stockholders who appointed him retained the ability to exercise a majority of the company's voting power to remove him from the board and terminate him as CEO if they did not support his allocation proposal. Those facts satisfy [P]laintiffs' low burden to demonstrate a credible basis to investigate possible wrongdoing in connection with the token allocation.

. . . .

In an effort to demonstrate a lack of wrongdoing, Switchboard argues that similar tiers of allocations for leadership, employees and advisors are commonplace in the crypto industry. Switchboard's arguments may well win the day in plenary litigation, but, as Delaware Supreme Court precedent makes clear, "a Section 220 proceeding 'is not the time for a merits assessment of Plaintiffs' potential claims against [the corporation's] fiduciaries." . . . At this stage, I instead must assess whether [P]laintiffs have come forward with some facts supporting a credible basis to infer possible wrongdoing, and for the reasons I just explained, [P]laintiffs have satisfied that low bar with respect to the token allocation.

*Id.* at 26–27 (quoting *AmerisourceBergen Corp. v. Lebanon Cty. Empls.' Ret. Fund*,

243 A.3d 417, 437 (Del. 2020)).

4

d. Switchboard did not "satisf[y] its burden to prove, by a preponderance of the evidence, that [P]laintiffs' stated purposes are not their true purposes for seeking books and records." *Id.* at 30; *see also id.* at 27–30.

e. Plaintiffs were entitled to inspect some, but not all, of the books and records sought in the Demand.[2] *Id.* at 33–38.

G. On March 25, the Court entered a Post-Trial Order and Judgment (the "Judgment"). Dkt. 94. Under the Judgment, Switchboard must produce books and records within ten business days of entry of the Judgment. *See* Dkt. 94 ¶ 1; *id.* cmts. (modifying paragraph 1 to require production within ten business days).[3]

H. On March 26, Switchboard filed a Motion to Stay Pending Appeal (the "Motion to Stay"). Def.'s Mot. to Stay Pending Appeal [hereinafter Mot.], Dkt. 95.

---

[2] The Bench Ruling directed Switchboard to produce financial statements, materials concerning Mugglestone's appointment, and formal board materials concerning the Token Allocation, to the extent such documents had not already been produced. BR at 33–35. The Bench Ruling denied Plaintiffs' requests for informal director- and officer-level materials, explaining that, "[a]lthough the company has not produced board meeting minutes, it has produced detailed board resolutions formally evidencing the directors' decisions, which, under the circumstances, are effectively the equivalent of board meeting minutes. Those resolutions, along with the other formal materials provided to the board (including the Token Allocation Assessment Framework memo), generally are sufficient to identify 'the who, what, where, when, and why of the possible wrongdoing.'" *Id.* at 36–37.

[3] On April 7, the Court issued a minute order directing that "[d]eadlines under the Post-Trial Order and Judgment (Dkt. 94) will be held in abeyance until the Court has ruled on Defendant's Motion to Stay Pending Appeal (Dkt. 95)." Dkt. 100.

In the Motion to Stay, Switchboard represents that it "intends to promptly appeal the [Final] Order."[4]  *Id.* ¶ 4.

I.       Plaintiffs filed an opposition to the Motion to Stay on April 1, 2025, and Switchboard filed a reply in further support of the Motion to Stay on April 2, 2025.  Pl.'s Opp'n to Def.'s Mot. to Stay Pending Appeal [hereinafter Opp'n], Dkt. 98; Reply in Further Support of Def.'s Mot. to Stay Pending Appeal [hereinafter Reply], Dkt. 99.

NOW, THEREFORE, IT IS HEREBY ORDERED, this 9th day of April 2025, as follows:

1.       Under Court of Chancery Rule 62(d), "[s]tays pending appeal and stay and cost bonds shall be governed by article IV, § 24 of the Constitution of the State of Delaware and by the Rules of the Supreme Court."  Ct. Ch. R. 62(d).  "[A] motion for stay must be filed in the trial court in the first instance. . . . A stay or an injunction pending appeal may be granted or denied in the discretion of the trial court, whose decision shall be reviewable by [the Delaware Supreme] Court."  Supr. Ct. R. 32(a).

2.       In assessing whether to grant a stay, the Court must (1) "make a preliminary assessment of likelihood of success on the merits of the appeal;"

---

[4] Although Plaintiffs argue that the Motion to Stay is not ripe because Switchboard has not yet filed its appeal, Opp'n ¶ 2, this Court has, on prior occasions, decided motions to stay pending a forthcoming appeal.  *See, e.g.*, *Inter-Local Pension Fund GCC/IBT v. Calgon Carbon Corp.*, 2019 WL 1280753, at *1–2 (Del. Ch. Mar. 20, 2019) ("[T]his action is stayed pending the outcome of Calgon's forthcoming appeal . . . .").

6

(2) "assess whether the petitioner will suffer irreparable injury if the stay is not granted;" (3) "assess whether any other interested party will suffer substantial harm if the stay is granted;" and (4) "determine whether the public interest will be harmed if the stay is granted." *Kirpat, Inc. v. Del. Alcoholic Beverage Control Comm'n*, 741 A.2d 356, 357 (Del. 1998) (citing *Evans v. Buchanan*, 435 F. Supp. 832, 841–42 (D. Del. 1977)).

3.      The first *Kirpat* factor "cannot be interpreted literally or in a vacuum." *Grand Acq., LLC v. Passco Indian Springs DST*, 2016 WL 6199007, at *1 (Del. Ch. Oct. 21, 2016) (quoting *Kirpat*, 741 A.2d at 358). Doing so "'would lead most probably to consistent denials of stay motions, despite the immediate threat of substantial irreparable injury to the movant,' because the trial court would be required first to confess error in its ruling before it could issue a stay." *Kirpat*, 741 A.2d at 357 (quoting *Evans*, 435 F. Supp. at 843). "If the other three factors strongly favor interim relief, then a court may exercise its discretion to reach an equitable resolution by granting a stay if the petitioner has presented a serious legal question that raises a 'fair ground for litigation and thus for more deliberative investigation.'" *Id.* at 358 (quoting *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977)).

4.      Switchboard has not, in my view, presented a serious legal question that raises a fair ground for litigation. Switchboard suggests that its arguments

7

concerning token issuances in the crypto industry present "matters of first impression,"[5] and that at trial, Switchboard "presented evidence that the token allocation challenged by Plaintiffs was commonplace in the crypto industry and that the allocation was approved by an undisputedly independent director, whereas Plaintiffs' evidence was largely limited to allegations that the Company's CEO was appointed by stockholders other than Plaintiffs and could have been removed by the Company's Board." Mot. ¶ 7. In truth, this case does not present any novel legal issues, nor does the Bench Ruling make broad (or any) pronouncements about compensation decisions approved by independent directors, as Switchboard contends.[6] *Id.* The merits factor does not favor a stay.

---

[5] Mot. ¶ 8. Switchboard does not explain what legal issues it believes raise matters of first impression.

[6] Switchboard claims that "[t]he Court ruled that a credible basis exists if stockholders who elected the director making compensation decisions (i) provide information relating to his decision, (ii) receive compensation as a result of his decision, and (iii) retain the ability to remove him from the Board—notwithstanding that all available evidence confirmed the compensation awarded to those stockholders was within industry norms." Reply ¶ 7. In fact, the Bench Ruling narrowly concluded that, based on the evidentiary record developed at trial, Plaintiffs met their burden to demonstrate a credible basis to investigate the Token Allocation where three stockholders holding a majority of the company's voting power acted together to appoint a director with the singular purpose of naming him CEO and tasking him with developing a proposal on the Token Allocation; those stockholders then participated in the new CEO's process to develop that proposal; and the resulting Token Allocation awarded those three stockholders a disproportionate share of the issued tokens.

Switchboard also states that it "intends to appeal the Court's ruling that Plaintiffs' actual purpose was not improper," Reply ¶ 7, but the sincerity of Plaintiffs' stated purposes is a factual determination unlikely to be overturned on appeal.

5.     Under the second *Kirpat* factor, "[a] production under Section 220 pending an appeal of that production may constitute irreparable harm . . . ." *Inter-Local Pension Fund*, 2019 WL 1280753, at *2. Switchboard argues that it will suffer irreparable harm in the absence of a stay here because (1) "if the documents at issue are produced and the Supreme Court then reverses the Order, the Company will be left with no effective remedy for this harm and will have unnecessarily incurred expense in carrying out the production order," and (2) a production of books and records would moot its appeal. Mot. ¶¶ 9–12. Although Switchboard has identified some potential irreparable injury, "by this logic, courts would have to grant stays pending appeal in every case involving the production of books and records[,]" yet that "is not the law in Delaware." *In re UnitedHealth Gp. Inc.*, 2018 WL 2110958, at *2 (Del. Ch. Apr. 27, 2018). As a result, the second *Kirpat* factor "weighs in favor of granting the stay, but I am not convinced that it alone weighs 'strongly' enough to warrant a stay." *Id.*

6.     Under the third factor, "[o]rdinarily, a Section 220 petitioner would not face a threat of substantial harm from a stay pending appeal." *Amalgamated Bank v. Yahoo! Inc.*, 2016 WL 866693, at *2 (Del. Ch. Mar. 4, 2016). Plaintiffs argue that further delay of this summary proceeding will cause irreparable harm, but that "reasoning would require denial of a stay in any summary or expedited proceeding."

9

*In re UnitedHealth Gp. Inc.*, 2018 WL 2110958, at \*2. "At best, this factor weighs slightly in favor of denying the stay." *Id.*

7.     Under the fourth factor, "[n]either litigant provides convincing arguments that the public interest will be harmed if the stay is granted or denied." *Id.* at \*3. Although Plaintiffs assert that Switchboard's "aggressive and dilatory tactics" militate against a stay,[7] I find this factor is neutral.

8.     Weighing all four factors, even assuming Switchboard's forthcoming appeal will present a serious legal question that raises a fair ground for litigation, the other factors do not weigh "strongly" in favor of granting a stay. "It is possible, however, that the Delaware Supreme Court disagrees." *In re UnitedHealth Gp. Inc.*, 2018 WL 2110958, at \*1. "Recognizing that the Delaware Supreme Court may balance the factors differently, this Court has taken the precaution of granting a conditional stay pending appeal that preserves the status quo to enable the appellant to seek a longer stay from the Delaware Supreme Court." *Id.* (first citing *Ward v. Schmalhofer*, 2017 WL 87478, at \*3 (Del. Ch. Jan. 9, 2017) (ORDER); and then citing *Jagodzinski v. Silicon Valley Innovation Co., LLC*, 2011 WL 4823569, at \*4 (Del. Ch. Aug. 16, 2011)).

---

[7] Opp'n ¶ 31; *see id.* ¶ 32 ("[R]ewarding Defendant's tactics with additional delay would embolden similar tactics by Section 220 defendants and undermine the very purpose of Section 220 and public policy.").

9.     That approach is appropriate here.  The effect of the Judgment will be stayed through the tenth day after Switchboard files its appeal.  If Switchboard fails to move for a stay before the Delaware Supreme Court within that period, the stay will lift.  If Switchboard does file a motion to stay before the Delaware Supreme Court, then this stay will remain in effect until the Delaware Supreme Court has ruled on it.

10.     Finally, Plaintiffs argue that if a stay is entered, the Court should enjoin Switchboard "from distributing the tokens or otherwise taking any action to alter the status quo with respect to the token issuance or allocation pending appeal and order [Switchboard] to post security in the amount of $1,000,000." Opp'n ¶ 35. Plaintiffs' opposition to the Motion to Stay is not an appropriate vehicle to seek an injunction, and a nominal bond of $1,000 is "reasonable in this books and records case." *Grand Acq.*, 2016 WL 6199007, at *2.  Switchboard shall post a bond in the amount of $1,000 within ten days of the entry of this Order.

*/s/ Bonnie W. David*

Bonnie W. David
Vice Chancellor
